307 F.3d 222
 BERWIND CORPORATION
v.
COMMISSIONER OF SOCIAL SECURITY; United Mine Workers of America Combined Benefit Fund; Michael H. Holland; William P. Hobgood; Marty D. Hudson; Thomas O.S. Rand; Elliot A. Segal; Carl E. Vanhorn; Gail R. Wilensky, as Trustees of the United Mine Workers of America Combined Benefit Fund; the United Mine Workers of America 1992 Benefit Plan; A. Frank Dunham, as Trustee of the United Mine Workers of America 1992 Benefit Plan; United States of America
United Mine Workers of America Combined Benefit Fund, Michael H. Holland, William P. Hobgood, Marty D. Hudson, Thomas O.S. Rand, Elliot A. Segal, Carl E. VanHorn, Gail R. Wilensky, the United Mine Workers of America 1992 Benefit Plan, A. Frank Dunham, United States of America, Appellants
Berwind Corporation, Appellant
v.
Commissioner of Social Security; United Mine Workers of America Combined Benefit Fund; Michael H. Holland; William P. Hobgood; Marty D. Hudson; Thomas O.S. Rand; Elliot A. Segal; Carl E. Vanhorn; Gail R. Wilensky, as Trustees of the United Mine Workers of America Combined Benefit Fund; the United Mine Workers of America 1992 Benefit Plan; A. Frank Dunham, as Trustee of the United Mine Workers of America 1992 Benefit Plan; United States of America
Berwind Corporation
v.
Commissioner of Social Security; United Mine Workers of America Combined Benefit Fund; Michael H. Holland; William P. Hobgood; Marty D. Hudson; Thomas O.S. Rand; Elliot A. Segal; Carl E. Vanhorn; Gail R. Wilensky, as Trustees of the United Mine Workers of America Combined Benefit Fund; the United Mine Workers of America 1992 Benefit Plan; A. Frank Dunham, as Trustee of the United Mine Workers of America 1992 Benefit Plan; United States of America Commissioner of Social Security, Appellant
 No. 00-3729.
 No. 00-3798.
 No. 00-3830.
 United States Court of Appeals, Third Circuit.
 October 2, 2002.
 
 Peter Buscemi, (Argued), John Mills Barr, Robert C. Farley, Morgan, Lewis & Bockius LLP, Washington, John R. Mooney, Mooney, Green, Gleason, Baker, Gibson & Saindon, P.C., Washington, David W. Allen, Office of General Counsel, UMWA Health and Retirement Funds, for Appellants/Cross-Appellees UMWA Combined Benefit Fund, UMWA 1992 Benefit Plan, and their respective trustees.
 Stuart E. Schiffer, Acting Assistant Attorney General, Michael R. Stiles, United States Attorney, Mark B. Stern, Jonathan H. Levy, (Argued), Attorneys, Appellate Staff, Civil Division, Department of Justice, Washington, for Appellant/Cross-Appellee, Commissioner of Social Security.
 Arthur Newbold, (Argued), Ethan D. Fogel, Andrew S. Miller, Dechert Price & Roads, Philadelphia, for Appellee/Cross-Appellant, Berwind Corporation.
 Before SLOVITER, NYGAARD and McKEE, Circuit Judges.
 OPINION OF THE COURT
 McKEE, Circuit Judge.
 
 
 1
 The basic question we must answer in these consolidated appeals is whether assignments the Commissioner of Social Security made pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), 26 U.S.C. SS 9701-9722 are unconstitutional pursuant to Eastern Enterprises v. Apfel, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). The Commissioner assigned beneficiaries of the United Mine Workers of America Combined Fund to Berwind Corporation as provided in the Coal Act. Those beneficiaries were either miners who had been employed by Berwind prior to 1962 or they were dependents of miners who had been so employed. Berwind permanently ceased coal mining operations in 1962. Nevertheless, for the reasons that follow, we hold that assignments are valid because the Act is not unconstitutional as applied to Berwind.
 
 I. THE COAL ACT
 
 2
 This case involves yet another of the disputes arising from the historic enactment of the Coal Act and the economic and social forces that spawned it. The history of the Act has been recited in great detail in the Supreme Court's opinion in Eastern Enterprises v. Apfel, and to a lesser extent in our opinions in Unity Real Estate v. Hudson, 178 F.3d 649 (3d. Cir.1999), and Anker Energy Co. v. Consolidation Coal Co., 177 F.3d 161 (3d Cir.1999).[1] Thus, we need not repeat that history here except insofar as it may be helpful to our discussion.
 
 
 3
 The Coal Act was enacted in 1992 "to resolve the imminent insolvency of multi-employer trusts created by coal industry agreements," Coltec v. Hobgood, 280 F.3d 262, 265 (3d Cir.2002). Congress wanted "to ensure that retired coal miners and their dependents would continue to receive the health and death benefits they had been receiving since the 1940s pursuant to a series of collective bargaining agreements." Anker Energy Corp. v. Consolidation Coal Co., 177 F.3d at 163-64.
 
 
 4
 In enacting the Coal Act, Congress intended to remedy problems with funding retiree health benefits in the coal industry by providing for sufficient operating assets for health benefit plans. Congress also intended to provide for the continuation of a privately funded and self-sufficient program that would deliver health care benefits to retired miners and their dependents. Pub.L. No. 102-486, § 19142(b), 106 Stat. 3036, 3037 (1992), 26 U.S.C. § 9701 note. Congress created two new statutory trust funds to achieve these ends; the Combined Fund and the 1992 Plan.[2]
 
 
 5
 The Coal Act required that certain benefit plans previously established under collective bargaining agreements with the United Mine Workers of America ("UMWA") be merged into a new plan — the United Mine Workers of America Combined Benefit Fund. 26 U.S.C. § 9702(a). This "Combined Fund" provides health and death benefits to retired coal miners and dependents who were eligible to receive benefits from the UMWA 1950 or 1974 benefit plans as of July 20, 1992. 26 U.S.C. §§ 9703(a), (b)(1), (c), (e) & (f). The 1992 Plan was an entirely new entity designed to provide benefits to those eligible retirees and their dependents who are not beneficiaries of the Combined Fund and who are not receiving health care coverage directly from their former employees. 26 U.S.C. § 9712. Benefits paid through the Combined Fund are funded in part by premiums imposed on "signatory coal operators," i.e., coal operators that employed an eligible beneficiary and that also signed a collective bargaining agreement between the UMWA and Bituminous Coal Operators' Association ("BCOA").[3] The Act also required that other "related persons" connected to the signatory operator by common ownership or control pay such premiums. See 26 U.S.C. §§ 9701(c)(1) & (c)(2), 9704, 9706.
 
 
 6
 The Coal Act directs the Commissioner of Social Security[4] to assign each individual beneficiary to one of these signatory coal operators or its "related person" in accordance with specified criteria. These criteria establish a system of priorities based upon the length of the beneficiary's service, the date of his service, and whether his employer participated in national collective bargaining agreements with the UMWA that were signed in 1978 or subsequent years.[5] 26 U.S.C. § 9706(a). The system of assigning beneficiaries by the Commissioner involves three steps or tiers that we have described as the "linchpin" of the Coal Act's statutory scheme. Unity Real Estate Co. v. Hudson, 178 F.3d at 654. The Coal Act provides:
 
 
 7
 (a) In general. — For purposes of this chapter, the Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:
 
 
 8
 (1) First, to the signatory operator which —
 
 
 9
 (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.
 
 
 10
 (2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which —
 
 
 11
 (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and
 
 
 12
 (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.
 
 
 13
 (3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.
 
 
 14
 26 U.S.C. § 9706(a)(1), (2) & (3). Once the Commissioner makes an assignment under § 9706, the assignee must then pay annual premiums to the Combined Fund based on the amounts needed to provide health and death benefits for the assigned beneficiaries.
 
 
 15
 If a miner or his dependents cannot be assigned to an extant company under this scheme, benefits are funded by either asset transfers from one of the Combined Fund's predecessor benefit plans, see 26 U.S.C. § 9705(a), transfers from the U.S. Treasury's Abandoned Mine Land Reclamation Fund, see 26 U.S.C. § 9705(b), 30 U.S.C. § 1232(h), or, if those sources are insufficient or unavailable, an additional unassigned — or "orphaned" — retiree premium is imposed on all signatory operators. See 26 U.S.C. §§ 9704(d), 9705(a)(3)(B), 9705(b)(2).
 
 
 16
 The Combined Fund's assignment structure also includes a set of statutory provisions governing the imposition of Coal Act liability on business entities that are deemed "related persons" with respect to miners' original employers. The Coal Act sets forth several provisions that, taken together, treat a commonly controlled group of related corporations as a single employer. This "grouping" is an integral part of the Coal Act. It allows responsibility for miners' benefits to be assigned both to the original employer and to a wide range of affiliated companies or successors. Premium assignments may be made either to a "signatory operator" that employed the miner or to any "related person." 26 U.S.C. § 9706(a). A "related person" is defined to include all members of a commonly controlled group of corporations that includes the signatory, other businesses under common control with the signatory, and subsequent successors in interest to any of these affiliated entities. 26 U.S.C. § 9701(c)(2)(A). A "controlled group" of corporations is in turn defined as a group of companies in which a common parent or concentration of individual economic interests owns or controls more than 50% of the stock in each of the affiliated companies. See 26 U.S.C. § 9701(c)(2)(A), incorporating by reference 26 U.S.C. § 52(a) & (b), which in turn incorporates by reference 26 U.S.C. § 1563(a). The determination of which entities are "related persons" for purposes of the Coal Act turns on the companies' structure and/or ownership as of a "look back" date of July 20, 1992. 26 U.S.C. § 9701(c)(2)(B).
 
 
 17
 These "related persons" have a broad, shared responsibility for statutory premiums. The Coal Act expressly provides that any company within the commonly controlled group may be treated as having employed a related signatory's miners. 26 U.S.C. § 9706(b). In addition, related persons may be held "jointly and severally liable for any premium required to be paid" by its affiliated signatory operator. 26 U.S.C. § 9704(a). Congress instructed the Commissioner to complete initial assignment of miners promptly after the Coat Act's 1992 enactment. The statute thus states: "For purposes of this chapter, the Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator...." 26 U.S.C. § 9706(a).[6] With regard to the 1992 Plan, the Coal Act also requires the last signatory operator to which each 1992 Plan beneficiary is attributable to pay a monthly premium for each attributable beneficiary to cover the cost of that beneficiary's health care. See 26 U.S.C. § 9712(d)(1)(b), (3). The Commissioner of Social Security therefore plays no role in assigning 1992 Plan beneficiaries. Rather, the last signatory operator of each such beneficiary is automatically responsible for the respective beneficiary's health care. If the last signatory operator under the 1992 Plan is no longer in business, its premiums are provided by additional premiums imposed on a proportional basis on signatories to the 1988 National Bituminous Coal Wage Agreement ("NBCWA"). 26 U.S.C. §§ 9701(c)(3); 9712(d)(1)(A), (6).
 
 
 18
 II. BERWIND CORPORATION'S HISTORY AND ITS INVOLVEMENT IN THE COAL INDUSTRY
 
 
 19
 Berwind Corporation was originally incorporated in 1915 as "The Berwind-White Coal Mining Company". Berwind-White signed the 1950 NBCWA and the 1951, 1952, 1955, 1956 and 1958 amendments thereto. The company mined coal until 1962, when it permanently ceased coal mining operations. It never employed any UMWA-represented coal miners in any capacity after it closed its last mine in 1962.
 
 
 20
 However, in 1963, Berwind-White became the 98% shareholder of Reitz Coal Company. It later acquired the remaining 2% of the outstanding shares thus making Reitz Coal Company its wholly owned subsidiary. Reitz Coal Company was a signatory to the 1950 NBCWA when Berwind-White acquired it.[7]
 
 
 21
 In 1967, Berwind-White changed its name to "Berwind Corporation." In 1978, Berwind formed a partnership with Scallop Coal Corp., affiliate of Royal Dutch Shell Petroleum Corp., in which each partner had a 50% interest. The partnership, known as "Reitz Coal Associates", was formed for the purpose of marketing coal produced by Reitz Coal Company, which was still a subsidiary of Berwind.
 
 
 22
 In 1983, Reitz Coal Associates changed its name to "Devon Coal Associates." That same year, Reitz Coal Company leased its coal mining assets and coal reserves to the Midlothian Company, which in turn subleased them to Devon Coal Associates. Devon Coal Associates operated the mines owned by Reitz Coal Company and assumed Reitz Coal Company's obligations under the 1981 NBCWA.
 
 
 23
 In July 1983, Berwind transferred its 50% interest in the Devon Coal Associates partnership to Old Devon, Incorporated; a wholly-owned subsidiary of Berwind. Reitz Coal Company also changed its name to "Reitz Corporation" and the Devon Coal Associates partnership changed its name to "Reitz Coal Company."
 
 
 24
 In May 1992, Old Devon, Inc., purchased the remaining 50% interest in the partnership now known as Reitz Coal Company. As a result, the partnership ceased to exist by operation of law and all of the partnership's assets and liabilities vested in Old Devon, Inc.
 
 
 25
 On June 19, 1992, Old Devon, Inc., changed its name to "Reitz Coal Co." This new Reitz Coal Co. remained a wholly-owned subsidiary of Berwind. On December 31, 1993, the original Reitz, i.e., "Reitz Corp.", was dissolved.
 
 
 26
 Although the constant name changes and shifting corporate structures create a rather ephemeral corporate lineage, one fact remains essential for our analysis: from 1963 until today, Berwind has owned at least 98% of the entity originally known as "Reitz Coal Co."; an entity which signed the 1974, 1978 and 1981 NBCWAs. In September of 1984, the UMWA declared a strike against the entity originally known as Reitz Coal Co. It was unable to reach an agreement with the UMWA on a successor contract to the 1981 NBCWA and its mines never reopened. It never mined coal after 1984, either with or without UMWA miners, and it never again employed UMWA members in any other capacity. Today, Berwind is a closely-held, family corporation which has investments in a wide variety of businesses, a number of which are unrelated to mining coal. However, Berwind remains in the coal industry as some of its subsidiaries lease land to coal mining companies and others purchase coal and prepare it for resale. Thus, Berwind is "in business" for purposes of the Coal Act. 26 U.S.C. § 9701(c)(7). In addition, Berwind admits that it still owns the now defunct Reitz Corp. and that Berwind and Reitz are "related persons" as defined in the Coal Act. 26 U.S.C. § 9701(c)(2).
 
 III. THE COMMISSIONER'S COAL ACT ASSIGNMENTS
 
 27
 In accordance with § 9706(a) of the Coal Act, 1,923 Combined Fund Beneficiaries who were previously employed by, or were dependents of people previously employed by, Berwind (and certain companies that merged into Berwind in the 1960s) were assigned to Berwind by the Commissioner as of February 1, 1993. As of October 1, 1998, the number of Combined Fund beneficiaries assigned to Berwind had dropped to 1,209, primarily due to the high mortality rate of the Combined Fund's elderly beneficiary population. Berwind's monthly liability for the Plan Year 1998 — the most recent in the record — was $295,793.93. Berwind unilaterally ceased making payments in or around July 1998, and, as of May 25, 1999, its Combined Fund liability was $3,220,473.81. Berwind was also assigned premium liability for five Combined Fund beneficiaries who had worked for Reitz.
 
 
 28
 Under § 9712 of the Coal Act, 26 U.S.C. § 9712, one 1992 Plan beneficiary was attributable to Berwind from the outset, and two additional 1992 Plan beneficiaries, who began receiving benefits in March of 1995, were also attributable to Berwind.[8] As of December 1998, the number of 1992 Plan beneficiaries directly attributable to Berwind had dropped to two. Berwind's monthly premium was then $566.50. Berwind unilaterally ceased making payments to the 1992 Plan in or around July 1998 and, as of May 25, 1999, Berwind owed the 1992 Plan $6,299.62.[9]
 
 
 29
 IV. BERWIND'S RESPONSE TO THE COMBINED FUNDS BENEFICIARIES' ASSIGNMENTS
 
 
 30
 On September 2, 1993, after the Commissioner made Coal Act assignments to Berwind, Berwind and three co-plaintiffs sued the Secretary of Health and Human Services[10] and the Combined Fund in the United States District Court for the Southern District of Indiana. Plaintiffs claimed that the Commissioner's Coal Act assignments violated the Takings and Due Process Clauses of the Fifth Amendment. The district court granted summary judgment in favor of the defendants and against Berwind. That ruling was affirmed on appeal, and the Supreme Court denied certiorari. Templeton Coal Co. v. Shalala, 882 F.Supp. 799 (S.D.Ind.1995), aff'd sub nom., Davon, Inc. v. Shalala, 75 F.3d 1114 (7th Cir.), cert. denied, 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) ("Berwind I"). Twenty-two months after certioriari was denied in Berwind I, the Supreme Court decided Eastern Enterprises v. Apfel.
 
 
 31
 V. EASTERN ENTERPRISES AND THE COMMISSIONER'S RESPONSE
 
 
 32
 In Eastern Enterprises, the Court considered the constitutionality of the Coal Act as applied to Eastern Enterprises, a company that had been involved in coal mining until 1965, and had signed every NBCWA from 1947 until 1964. Pursuant to 26 U.S.C. § 9706(a)(3), the Commissioner assigned Coal Act liability to Eastern for over 1000 miners, based on Eastern's status as the pre-1978 signatory operator for whom the miners had worked for the longest period of time. Its total liability was estimated to be between $50 and $100 million. Eastern claimed that § 9706(a)(3) was unconstitutional as applied to it because the enactment violated both the Due Process and Takings Clauses of the Fifth Amendment.
 
 
 33
 Although a majority of the justices agreed § 9706(a)(3) was unconstitutional as applied to Eastern Enterprises, they could not agree on a rationale. A four-justice plurality concluded that the Act violated the Fifth Amendment as applied to Eastern as it was an unconstitutional taking. Eastern Enterprises, 524 U.S. at 537, 118 S.Ct. 2131. The plurality recognized that a Takings analysis is "essentially an ad hoc and fact intensive" inquiry. Nonetheless, the justices were able to identify three factors that were generally of particular significance: "the economic impact of the regulation, its interference with investment backed expectations, and the character of the governmental action." Id. at 523-524, 118 S.Ct. 2131 (quoting Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)). The plurality then reviewed its Takings Clause analysis in cases involving legislative schemes similar to the Coal Act. This included suits under the Black Lung Benefits Act, and the Multiemployer Pension Plan Amendments Act ("MPPAA") which was enacted to supplement the Employee Retirement Income Security Act ("ERISA"). The Court concluded:
 
 
 34
 Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties. Congress may also impose retroactive liability to some degree, particularly where it is confined to short and limited periods required by the practicalities of producing national legislation. Our decisions, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience.
 
 
 35
 Id. at 528-529, 118 S.Ct. 2131 (citation and internal quotations omitted) (emphasis added).
 
 
 36
 The plurality, applied this Takings Clause jurisprudence to Eastern Enterprises by first focusing on the economic impact of the Coal Act, and concluded that the Act placed a "considerable financial burden" on Eastern Enterprises. Id. at 529, 118 S.Ct. 2131. Although the plurality conceded that this financial burden was not a "permanent physical occupation of Eastern's property of the kind [usually] viewed as a per se taking," it reasoned that decisions upholding the MPPAA "suggest that an employer's statutory liability for multiemployer pension plans should reflect some proportionality to its experience with the plan." Id. at 530, 118 S.Ct. 2131 (citation and internal quotations omitted). The assignments to Eastern lacked such proportionality. Although Eastern did contribute to the 1947 and 1950 W & R Funds, "it ceased its coal mining operations in 1965 and neither participated in negotiations nor agreed to make contributions in connection with the 1974, 1978, or subsequent NBCWAs." Id. The absence of any nexus to the 1974 and later NBCWAs was significant because those agreements were the "first [to] suggest an industry commitment to funding lifetime health benefits for both retirees and their family members." Id. Thus, because Eastern Enterprises had neither contemplated liability for the provision of lifetime benefits to miners nor contributed to the miners' expectations of such benefits, the plurality concluded that, even though Eastern had employed the assigned miners at some point, "the correlation between Eastern and its liability to the Combined Fund is tenuous, and the amount assessed against Eastern resembles a calculation made in a vacuum." Id. at 531, 118 S.Ct. 2131 (citation and internal quotations omitted).
 
 
 37
 The plurality also concluded that proportionality was lacking with regard to the two other Takings Clause factors. The Coal Act's "substantial and particularly far reaching" retroactivity[11] interfered with Eastern's reasonable investment backed expectations. Id. at 534, 118 S.Ct. 2131. The plurality reasoned that because a coal industry employer could not have contemplated liability for lifetime benefits to miners until the 1974 NBCWA, "the Coal Act's scheme for allocation of Combined Fund premiums is not calibrated either to Eastern's past actions or to any agreement — implicit or otherwise — by the company." Id. at 536, 118 S.Ct. 2131. Finally, the plurality concluded that the "nature of governmental action ... is quite unusual," and "implicates fundamental principles of fairness underlying the Takings Clause," because it "singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers' made or to any injury they caused." Id. at 537, 118 S.Ct. 2131.
 
 
 38
 Therefore, because each of the significant factors in a Takings analysis was implicated, the plurality found that the Act was an unconstitutional taking as applied to Eastern Enterprises.
 
 
 39
 Justice Kennedy, provided the fifth vote striking down the Act as unconstitutional as applied, but he disagreed with the plurality's Takings Clause analysis. Rather, he concluded that the Act's retroactivity violated due process. Id. at 539-50, 118 S.Ct. 2131. He applied an "arbitrary and irrational" standard of review, Id. at 547, 118 S.Ct. 2131, and focused on the fact that Eastern Enterprises had not signed a 1974 or later NBCWA. He reasoned:
 
 
 40
 Eastern was once in the coal business and employed many of the beneficiaries, but it was not responsible for their expectation of lifetime benefits or for the perilous condition of the 1950 and 1974 plans which put the benefits in jeopardy. As the plurality discusses in detail, the expectation was created by promises and agreements made long after Eastern left the coal business. Eastern was not responsible for the resulting chaos in the funding mechanism caused by other coal companies leaving the framework of the National Bituminous Coal Wage Agreement. This case is far outside the bounds of retroactivity permissible under our law.
 
 
 41
 Id. at 550, 118 S.Ct. 2131 (emphasis added).
 
 
 42
 The four dissenting justices agreed with Justice Kennedy that the application of the Act did not violate the Takings Clause, but disagreed with his view that the Act violated the Due Process Clause. Id. at 556-67, 118 S.Ct. 2131.
 
 
 43
 In subsequent cases discussing the decision in Eastern Enterprises, we have noted that the "splintered nature" of the Court's decision made "it difficult to distill a guiding principle from Eastern." Unity Real Estate Co., 178 F.3d at 658. However, as recited above, both the plurality and Justice Kennedy focused on one significant fact. The 1974, 1978 and subsequent NBCWAs were the first wage agreements that included a commitment to funding lifetime health benefits for retired miners and their dependents. No such commitment was contained in any earlier wage agreement. Because Eastern Enterprises was not a signatory to either the 1974 or the 1978 NBCWAs, it could not have contemplated that it would be responsible for contributing to the miners' expectation of lifetime health benefits. See Anker Energy Corp. v. Consolidation Coal Co., 177 F.3d at 172 ("[A]nalysis of the decisions in Eastern Enterprises leads us to the conclusion that a majority of the Court would find the Act unconstitutional when applied to an employer that did not agree to the 1974 or subsequent NBCWAs, while application of the Act to a signatory to the 1974 or subsequent wage agreement would be an entirely different matter."); see also, Association of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1257 (D.C.Cir. 1998) ("The clear implication of each opinion in Eastern Enterprises is that employer participation in the 1974 and 1978 agreements represents a sufficient amount of past conduct to justify the retroactive imposition of Coal Act liability (for the dissenting justices, of course, such participation is not even necessary."))
 
 
 44
 On September 24, 1998, the Commissioner voided the Coal Act beneficiary assignments of 113 companies that he concluded were similarly situated to Eastern Enterprises. He also decided that no beneficiaries would be assigned to another 11 similarly situated companies that had not yet received assignments. The group whose assignments were voided by the Commissioner included Berwind's three co-plaintiffs in Berwind I.[12] Berwind also ceased making premium payments (after June 1998) and requested that the Commissioner void Berwind's assignment as well. The Commissioner refused, and this lawsuit followed.
 
 VI. DISTRICT COURT PROCEEDINGS
 
 45
 On November 12, 1998, Berwind filed suit in the United States District Court for the Eastern District of Pennsylvania seeking a declaration that the Coal Act violates the Takings and Due Process Clauses of the Fifth Amendment. Berwind named the Commissioner of Social Security and the Combined Fund and its Trustees as defendants. On February 3, 1999, Berwind amended its complaint by naming the 1992 Plan and its Trustees as additional defendants.
 
 
 46
 In Counts I and II of its eight count complaint, Berwind alleged that the Coal Act violates the Due Process Clause and the Takings Clause as the Act applies to Berwind. In Count III, Berwind alleged that the entire Coal Act is unconstitutional. In Count IV, Berwind asserted a statutory claim for a refund of premiums paid since April 1995. Berwind argued that such a refund was required under Section 9706(f)(3) of the Act, 26 U.S.C. § 9706(f)(3). In Count V, Berwind sought relief against the Commissioner of Social Security, claiming that the Commissioner violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), by refusing to void the assignment of Combined Fund beneficiaries to Berwind after Eastern Enterprises. In Counts VI, VII and VIII, Berwind alleged alternative claims for the refund of premiums that it had paid to the Combined Fund and the 1992 Plan since April 1995. Specifically, in Count VI, Berwind alleged a common law claim for restitution; in Count VII, a claim for a refund under the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1001 et seq.; and, in Count VIII, a claim against the United States for a tax refund.
 
 
 47
 The Combined Fund, the 1992 Plan, and their respective Trustees (collectively the "Trustees") answered and filed counterclaims seeking a declaration that the Coal Act does not violate either the Takings or the Due Process Clauses as applied to Berwind. They also sought to recover the assessed health care premiums that Berwind unilaterally stopped paying after the Court's Eastern Enterprises decision.
 
 
 48
 In time, all parties moved for summary judgment and the district court ruled on those motions in two separate opinions and orders. Berwind Corp. v. Apfel, 94 F.Supp.2d 597 (E.D.Pa.2000) and Berwind Corp. v. Apfel, 2000 WL 1337112 (E.D.Pa. Sept.15, 2000). The district court held that Berwind had fully litigated its constitutional claims in Templeton Coal Co. v. Shalala, supra and that the adverse judgment in that case was res judicata. Accordingly, the district court dismissed Counts I, II and III. However, the district court found that Berwind could proceed with its APA challenge to the Commissioner's decision not to void Berwind's Combined Fund beneficiary assignments after Eastern Enterprises. The court also ruled that the Commissioner had acted arbitrarily and capriciously in deciding not to void those assignments. Therefore, the district court granted summary judgment to Berwind on its APA claim in Count V and on its claim for restitution in Count VI. It awarded Berwind more than $14 million from the Combined Fund and more than $35,000 from the 1992 Plan,[13] and dismissed Berwind's remaining claims. The court rejected Berwind's claims under the Coal Act itself and under ERISA (as referenced in the Coal Act) because neither statute provides for a cause of action to recover alleged overpayments. Finally, the district court dismissed Berwind's claim for a tax refund because that claim was only made in the alternative and it was therefore superfluous because the court had ordered restitution from the Funds.
 
 
 49
 The district court also dismissed the Trustees' counterclaims, except that it found that Berwind was a "related person" to Reitz and that Berwind was therefore obligated to pay Coal Act premiums for those assigned beneficiaries who were retirees of Reitz. These appeals followed.
 
 VII. DISCUSSION
 
 50
 At first glance, these consolidated appeals appear to raise several interwoven, yet distinct issues. However, upon close examination, all of the issues — Berwind's as applied constitutional challenges,[14] its APA claim and its premium refund claims — turn on whether Berwind is in a substantially identical position to the plaintiff in Eastern Enterprises.[15]
 
 
 51
 As we noted earlier, the Court's judgment in Eastern Enterprises was not based on any single rationale. Where that happens, "`the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). However, the Marks rule only applies where "one opinion can be meaningfully regarded as `narrower' than another" and can "represent a common denominator of the Court's reasoning." Rappa v. New Castle County, 18 F.3d 1043, 1057 (3d Cir.1994) (quoting King v. Palmer, 950 F.2d 771, 781 (D.C.Cir.1991)) (en banc). Therefore, "in cases where approaches differ, no particular standard is binding on an inferior court because none has received the support of a majority of the Supreme Court." Anker Energy Corp., 177 F.3d at 170 (citing Rappa v. New Castle County, 18 F.3d at 1058).
 
 
 52
 In Unity Real Estate, we acknowledged that "Justice Kennedy's substantive due process reasoning in Eastern Enterprises is not a `narrower' ground that we might take to constitute the controlling holding." 178 F.3d at 658. Consequently, the only binding aspect of the fragmented decision in Eastern Enterprises is its "specific result," i.e., the Act is unconstitutional as applied to Eastern Enterprises. Anker Energy Corp., 177 F.3d at 170 (citing Association of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1255 (D.C.Cir.1998)). Given our analysis in Unity Real Estate, "Eastern ... mandates judgment for the plaintiffs only if they stand in a substantially identical position to Eastern Enterprises with respect to both the plurality and Justice Kennedy's concurrence."[16] 178 F.3d at 659.
 
 
 53
 Berwind concedes that it and Reitz are "related persons" as defined by the Coal Act, and therefore its obligation for the premium liability for the five Combined Fund beneficiaries formerly employed by Reitz is constitutional. However, Berwind submits that the assignments of the Combined Fund beneficiaries formerly employed by it are unconstitutional as applied because of Berwind's substantial identity to Eastern Enterprises. Berwind claims this substantial identity because, like Eastern Enterprises, it stopped its coal mining operations in the early 1960s; and, like Eastern Enterprises, it never signed a 1974 or later NBCWA. Therefore, argues Berwind, it never created or reinforced an expectation of lifetime health benefits in its assigned Combined Fund beneficiaries or their dependents. Indeed, Berwind argues that its circumstances are "better than" Eastern's, because Berwind stopped coal mining three years earlier than Eastern Enterprises did and its total Coal Act liability "is equal to or even larger than Eastern's was — as much as $138 million cumulatively, compared to between $51 million and $100 million for Eastern." Berwind's Brief as Appellee, at 23.
 
 
 54
 Berwind makes no other constitutional challenge to the Combined Fund assignments. It does not challenge the constitutionality of the Act's "related person" provisions and it does not challenge the constitutionality of the "controlled group" provisions. Therefore, as we said earlier, Berwind's as applied constitutional challenge, its APA claim and its restitution claim rise or fall on whether it is in a substantially identical position to Eastern Enterprises. For the reasoning that follows, we conclude that Berwind's position is materially different from Eastern Enterprises' and that the difference requires a different outcome.
 
 
 55
 Eastern Enterprises began operations in 1929 and mined coal in West Virginia and Pennsylvania until 1965. Eastern, 524 U.S. at 516, 118 S.Ct. 2131. It was a signatory to each NBCWA executed between 1947 and 1964 and made contributions to the 1947 and 1950 welfare and retirement funds of over $60 million. Id. In 1963, Eastern decided to spin-off its coal operations to a subsidiary, Eastern Associated Coal Corp. ("EACC"). Id. The spin-off was completed by 1965, but Eastern retained its stock interest in EACC through a subsidiary corporation, Coal Properties Corp. ("CPC") until 1987, and it received dividends of more than $100 million from EACC during that period. Id.
 
 
 56
 After 1965, Eastern ceased coal mining operations and was therefore not a signatory to the 1974 NBCWA or any subsequent wage agreements. As we have noted, the 1974 wage agreement was the first one to require an industry-wide commitment to funding lifetime health benefits of miners and their dependents. Id. at 530, 118 S.Ct. 2131. However, EACC did sign the 1974 and later NBCWAs even though Eastern Enterprises didn't. In 1987, Eastern sold its interest in CPC to Peabody Holding Co., Inc. Id. at 516, 118 S.Ct. 2131. As a consequence of that sale to an unrelated third party, Eastern had divested itself of all of its interests in its EACC subsidiary five years before the enactment of the Coal Act.
 
 
 57
 After the enactment of the Coal Act, the Commissioner assigned Eastern the obligation for Combined Fund beneficiary premiums for over 1,000 retired miners who had worked for Eastern before 1966 pursuant to § 9706(a)(3). The assignments were based on Eastern's status as the pre-1978 signatory operator for whom the miners had worked the longest. Id. at 517, 118 S.Ct. 2131. No miners who had been employed by EACC were assigned. Id. at 530, 118 S.Ct. 2131. Sometime after the Commissioner made the assignments, Eastern filed the aforementioned suit attacking the Act as unconstitutional as applied under the Takings and Due Process Clauses.
 
 
 58
 When we compare Eastern's circumstances with Berwind's, it is obvious that Berwind is not in a "substantially identical position to Eastern." Eastern's premium liability under the Coal Act was based solely on its having employed the miners assigned to it — miners in whom Eastern could not have created a reasonable expectation of lifetime health benefits because it never signed the 1974 NBCWA or subsequent NBCWAs. See Id. at 531, 118 S.Ct. 2131 ("The company's obligations under the Act depends solely on its roster of employees some 30 to 50 years before the statute's enactment, without any regard to responsibilities that Eastern accepted under any benefit plan the company itself adopted."). Eastern never addressed the question of premium liability under the Coal Act's "related person" provision, the basis of Berwind's liability here.
 
 
 59
 Berwind reminds us that Eastern Enterprises had a subsidiary, EACC, that signed a post-1974 NBCWA, and argues that Eastern Enterprises' relationship with EACC was not sufficient to sustain the constitutionality of the Commissioner's assignments of Combined Fund beneficiaries. However, this similarity does not put Berwind into Eastern's shoes because of one obvious and crucial distinction that Berwind glosses over. Eastern divested itself of EACC in 1987, five years before the enactment of the Coal Act and the "look back date" of July 20, 1992. As noted, the Coal Act provides that where ostensibly related companies remain in business, the question of whether they are "related persons" is determined with respect to their relationship as of July 20, 1992, a date shortly before the Act's passage. 26 U.S.C. § 9701(c)(2)(B). Because Eastern had sold EACC in 1987, EACC was not considered a "related person" to Eastern under the Act as of July 20, 1992. Therefore, premium liability could not have been imposed on Eastern based on any relationship it had to EACC. This distinction is fatal to Berwind's argument here.
 
 
 60
 Berwind not only glosses over the fact that Eastern Enterprises did not involve the Coal Act's related person provisions, it also glosses over the fact that we have twice held that premium liability under the Act's related person provisions removes an assignee from the holding of Eastern Enterprises, and defeats the required similarity to the position of that plaintiff. More precisely, we have twice held that related persons to coal companies that signed the 1974 NBCWA and later NBCWAs are not in a substantially identical position to Eastern Enterprises. Today, it is necessary to reiterate that principle yet again.
 
 
 61
 In Unity Real Estate, we upheld the constitutionality of the Coal Act as applied to a company that was a related person to both a pre-1974 NBCWA signatory and a post-1974 signatory. When the Commissioner made the premium assignments at issue there, Unity Real Estate Company was a small corporation closely held by members of the Jamison family. Unity owned a small commercial building and a parking lot. It never mined coal and never signed a coal wage agreement. Nonetheless, under the Coal Act, it was a related person to several, defunct coal mining companies formed by members of the Jamison family that ultimately merged into Unity. Among those companies were South Union-PA and South Union-WVA. South Union-PA had mined coal since 1923 and had signed the 1947 NBCWA and amendments thereto through 1961. South Union-WVA began mining when South Union-PA stopped and it had signed the 1974, 1978 and 1981 NBCWAs.[17]
 
 
 62
 The Commissioner assigned Combined Fund premium liability to Unity for the miners formerly employed by all of Unity's related person entities pursuant to §§ 9706(a)(1) & (2), and Unity challenged the assignments under Eastern. After a comprehensive analysis of the various opinions in Eastern, we upheld the constitutionality of the Coal Act as applied to Unity and all of the disputed assignments, including assignments of miners who had worked for South Union-PA, even though South Union-PA had never signed a 1974 or later NBCWA. The critical distinction was that Eastern Enterprises never signed the 1974 or later NBCWAs and it was not a related person to any entity that had. In contrast, South Union-WVA, its related person, had "signed". We noted that
 
 
 63
 [b]ecause the plaintiffs signed NBCWAs in 1974 and thereafter, they are factually distinguishable from Eastern Enterprises. Language in the plurality and the concurrence suggesting that expectations fundamentally changed after 1974 support our conclusions.
 
 
 64
 178 F.3d at 659. Just as that distinction was crucial in Unity Real Estate, the same distinction between Eastern and Berwind "compels the conclusion that Eastern is not on all fours with the case before us." Id.
 
 
 65
 In Anker Energy, we also upheld that Act's application to a related person with a nexus to a post-1974 signatory operator. We held that the fact that Anker's related person had agreed to the terms of the 1974, 1978, 1981 and 1984 NBCWAs "factually distinguishes Anker's situation from that of Eastern Enterprises and compels a finding that the Act is constitutional in this instance." 177 F.3d at 172. There, Consolidation Coal contracted with King Knob Coal for King Knob to mine coal on Consolidation's property from 1967 to 1982. As part of this arrangement, King Knob agreed that its employees would be UMWA members and that it would be a signatory to the then current NBCWAs.[18]
 
 
 66
 An affiliate of Anker acquired King Knob in 1975 and the relationship between Consolidation and King Knob continued until 1982 when Consolidation canceled its contract with King Knob. In 1994 and 1995, the Commissioner informed Anker that it was a related person to King Knob and assigned premium liability to Anker for King Knob's retired miners. Anker sued alleging that the Commissioner's assignments were unconstitutional under Eastern Enterprises. In rejecting that claim, we relied upon our earlier decision in Unity and held that because Anker's related person had agreed to be bound by the terms of the post-1974 NBCWAs, Anker's situation "falls outside the specific holding of Eastern Enterprises." Id. at 172. Accordingly, we concluded that the Act could constitutionally apply to Anker. Id.
 
 
 67
 Berwind nonetheless attempts to avoid being caught between the pincers of our prior case law. Berwind first argues that even if its related person status to Reitz means that it is not in a substantially identical position to Eastern Enterprises, it nonetheless cannot be liable for the health care premiums of its own retirees. Berwind claims this is because the Coal Act does not permit the Commissioner to treat Berwind as if it has signed the 1974 and later NBCWAs since Reitz, its related person, signed the 1974 and later NBCWAs. Put another way, Berwind argues that the Act does not allow the Commissioner to impute Reitz's signatory status to Berwind.
 
 
 68
 The Commissioner counters by pointing out that he has not imputed Reitz's signatory status to Berwind. Rather, the Commissioner claims that he has merely imputed employment status to all members of the same controlled group as the Coal Act requires. Therefore, argues the Commissioner, Berwind's assignment is based upon its own liability as part of a controlled group. According to the Commissioner, "[a]ny employment of a coal industry retiree in the coal industry by a signatory operator shall be treated as employment by any related persons to such operator." 26 U.S.C. § 9706(b)(1)(A). Consequently, the Commissioner argues that under the express provisions of the Coal Act, all of Berwind's former employees are treated as Reitz's former employees. Thus, in the Commissioner's view, Berwind's premium liability is based on the imputation of employment by one member of a controlled group to all members of that controlled group and not on the imputation of signatory status.
 
 
 69
 Berwind responds by arguing that the Commissioner's claim that § 9706(b)(1)(A) imputes employment status to all members of the same controlled group (or more concretely, that § 9706(b)(1)(A) means that Berwind's former employees are treated as Reitz' former employees) is based on a misconstruction of the statute. Berwind claims that § 9706(b)(1)(A) is not a statute that imputes employment status at all. Rather, it is merely an aggregation rule describing a method for deciding which of a miner's former employers to assign the former miner to. Berwind correctly notes that § 9706(b)(1)(A) — captioned "Aggregation rules (A) Related Person" — and which provides that "[a]ny employment of a coal industry retiree in the coal industry by a signatory operator shall be treated as employment by any related persons to such operator:" — only applies "for purposes of subsection [9706](a)." Section § 9706(a) sets out the criteria for assigning a former miner to a particular entity from among multiple coal operators that may have employed the miner.
 
 
 70
 Berwind argues that within the context of the broader § 9706(a) assignment scheme, § 9706(b)(1)(A) authorizes the Commissioner to aggregate the periods of time that a miner worked for two or more "related person" companies as the Commissioner determines which signatory operator to assign the miner to Berwind further argues that aggregation of a miner's employment time with two "related person" operators is potentially important because the length of time of a miner's employment is one of the factors used to determine assignments under the § 9706(a) scheme. Thus, says Berwind, § 9706(b)(1)(A) merely facilitates the assignment of individual former miners to signatory operators under the general § 9706(a) assignment scheme. According to Berwind, it does not allow the Commissioner to impute employment of a retired miner to all members of a controlled group.
 
 
 71
 However, we do not have to decide which of these intricate and overly technical readings is correct. Berwind does not claim that retired miners (or their dependents) were mistakenly assigned to it.[19] Rather, it claims that the assignments, though factually correct, render the Act unconstitutional as applied and that the assignments are therefore invalid. This is not an issue of statutory construction. Berwind's challenge distills down to its claim that it is in a substantially identical position to Eastern Enterprises, and it does not turn on the hypertechnical statutory construction it urges upon us. Moreover, it has not challenged the "related person" provision of the Act. Therefore, "[Berwind's] obligations under Eastern must stand or fall regardless of how [it] was assigned the beneficiaries." Unity Real Estate, at 655 n.2.
 
 
 72
 Berwind next argues that our Unity Real Estate and Anker Energy decisions do not support a finding that the Coal Act is constitutional as applied to it. According to Berwind, Unity and Anker hold that retired coal miners can be assigned to a related person of their former employer only if the former employer made promises of lifetime benefits to those miners by signing the 1974 or later NBCWAs. But, says Berwind, because it never signed the 1974 or subsequent NBCWAs, and thereby never promised lifetime health benefits to its former employees, its former employees cannot constitutionally be assigned to it, even though its related person, Reitz, did sign the 1974 and subsequent NBCWAs.
 
 
 73
 Berwind is wrong. In Anker, we upheld premium liability against a parent company because the parent company's related person had agreed to be bound by the terms of the 1974 and subsequent NBCWAs. Thus, we suppose that superficially Anker could be read as supporting Berwind's claim that it can only be bound if its related person agreed to the 1974 or subsequent agreements. However, Berwind's reading is extremely restrictive and ignores the fact that Anker was decided after Unity and applied principles established in that case.
 
 
 74
 Unity was not limited to holding that related persons to coal companies that signed the 1974 and subsequent NBCWAs are in a different position to Eastern Enterprises. We also applied a substantive due process analysis based upon a concern raised in Eastern Enterprises. The plurality in Eastern noted that the Court's prior decisions
 
 
 75
 have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience.
 
 
 76
 Eastern, 524 U.S. at 528-529, 118 S.Ct. 2131 (plurality). Recognizing that possibility, and "[t]o the extent that Eastern embodies principles capable of broader application," we felt obligated to apply an additional level of substantive due process analysis to determine if the assignments to the Companies there were constitutional as applied.[20] Unity, 178 F.3d at 659. That additional level of analysis focuses on "the extent of the gap between the coal companies' contractual promises to the Funds and the requirements of the Coal Act." Id.
 
 
 77
 We noted that the standard of review of legislation when a due process violation is alleged "is forgiving; it bars only arbitrary and irrational congressional action." Id. The first step in our due process analysis was an extensive review of the available evidence to determine if Congress had a sufficient basis to impose liability on companies "related" to coal companies that signed the 1974 or later NBCWAs. We weighed that evidence against four separate criteria, viz., responsibility for the Combined Fund's instability, the background of government regulation of the coal industry, the relevant contractual language and a company's history in the coal industry. Id. at 660-699. We concluded that Congress' finding that the coal industry's conduct created a reasonable expectation in the miners of lifetime benefits and its finding that the coal companies were primarily responsible for the deterioration of the Benefit Plans were "reasonable evaluations of the problem." Id. at 670.
 
 
 78
 Next, we focused on the Act's retroactivity and found that the retroactive reach of the Act was not irrational under the Due Process Clause. Id. We recognized that "[t]he heart of a retroactivity analysis is an evaluation of the extent of the burden imposed by a retroactive law in relation to the burdened parties' prior acts," and we held that "[w]here Congress acts reasonably to redress an injury caused or to enforce an expectation created by a party, it can do so retroactively." Id. at 670, 671. In examining the retroactivity in Unity, we first measured the time between a post-1974 related person signatory's commitment to pay for benefits and the date of the enactment of the Coal Act. Id. at 670. For Unity, the period of time was eleven years.[21] We found that this period of time, while "quite long," was "not so extensive as to violate Justice Kennedy's standard,[22] although Unity offers a close case["] id., despite the considerable financial burden imposed under the Act.[23]
 
 
 79
 Finally, we held that the burden imposed was not so unreasonable or disproportionate as to defeat the constitutionality of the Act.[24] The burden imposed, though not inconsequential, is justified by the industry's conduct of creating reasonable expectations of lifetime benefits, while establishing inadequately funded benefit funds. All this was compounded by the flight of operators from the coal industry seeking to avoid further contributions to the fund. Id. at 673. The Coal Act "is Congress's attempt to do equity." Id. at 672. The Coal Act did not violate substantive due process because Congress was entitled to remedy the problems caused by "the companies' actions, through the BCOA through which negotiations with the unions were conducted, [which] created reasonable expectations about benefits and established a funding structure vulnerable to `dumping' retirees when companies left the industry." Id. at 673. We concluded that the Coal Act "is targeted to address the problem of insufficient resources in the benefit funds and that it puts the burden on those who, in Congress's reasonable judgment, should bear it."[25] Id. at 674.
 
 
 80
 Despite the additional level of due process scrutiny we subjected the Commissioner's assignments to, we found that the Coal Act was constitutional as applied to Unity Real Estate Company.[26] A close examination of the facts in Unity confirms that we did not hold, as Berwind claims, that retired miners can be assigned to a related person of their former employer only if the former employer signed the 1974 or later NBCWAs. In fact, the assignments we upheld there were much more problematic than the assignments to Berwind.
 
 
 81
 As we have noted, Unity Real Estate was a small corporation closely held by the members of one family. It owned a small commercial building and a parking lot. It had never been in the coal business, had never mined coal and had never signed a NBCWA.[27] But, it had been a "related person" to several, defunct coal mining companies formed by members of the family that owned Unity Real Estate that were ultimately merged into Unity Real Estate. One of those companies, South Union-PA had mined coal since 1923, and had signed the 1947 NBCWA and amendments thereto through 1961, but had ceased mining coal in 1961. Another company, South Union-WVA, started mining coal in 1961 when South Union-PA stopped, and it thereafter signed the 1974, 1978 and 1981 NBCWAs, although a bankruptcy court allowed it to reject the 1981 NBCWA. Two other "related person" companies, Stewart Coal & Coke Company and Jamison Coal Company, did sign NBCWAs from the 1940s through the early 1970s. However, they never signed the 1974 or subsequent NBCWAs.
 
 
 82
 Despite the significant gulf separating Unity Real Estate and coal mining, the Commissioner assigned Combined Fund beneficiaries to Unity Real Estate for the miners formerly employed by all of Unity Real Estate's related person entities. This included miners who had worked for Unity Real Estate's related person entities who had never signed a 1974 or later NBCWAs as well as miners who had worked for Unity Real Estate's related person entity that had signed the 1974 and subsequent NBCWAs (i.e. South Union-WVA).
 
 
 83
 The majority of the Combined Fund beneficiaries assigned to it had not worked for South Union-WVA. Rather, they had worked for related persons that had signed only pre-1974 agreements. Jt.App. at 230 (Unity Real Estate's Responses to Defendants' First Request for Admissions, at P 28).[28] However, we found no substantive due process impediment to holding Unity Real Estate liable for the Coal Act assignments of miners whose former employers never made a promise of lifetime health benefits. So long as one related person member of the controlled group made a promise of lifetime health benefits to its retired miners, substantive due process did not prevent that promise from inuring to the benefit of all retired miners employed by each related person member of the controlled group even if those members never made such promises. Since substantive due process considerations did not invalidate the Commissioner's assignments to Unity Real Estate, we are at a loss to understand how Combined Fund beneficiary assignments to a company like Berwind, that was in the coal mining business until 1962 and continues to have ties to the coal industry, transcends substantive due process restrictions. Its related person was a signatory to the 1974, 1978 and 1981 NBCWAs.
 
 
 84
 Moreover, we note that Berwind's related person, Reitz, last signed a NBCWA in 1981. Thus, it is eleven years from the time Berwind's related person's contractual obligation to the Combined Fund ended to the passing of the Coal Act in 1992. That is exactly the period we found permissibly retroactive in Unity. Berwind does no better under the proportionality prong of Unity's due process analysis. Since Berwind's related person was a signatory to the 1974, 1978 and 1981 NBCWAs, Berwind bears the same responsibility as the Unity plaintiffs for creating a reasonable expectation of lifetime health benefits and for creating the problem of under-funding that the Coal Act seeks to remedy.[29]
 
 
 85
 Accordingly, we conclude that Berwind is not in a substantially identical position to Eastern Enterprises, and since Berwind's assignments survive our Unity substantive due process analysis, the Coal Act is not unconstitutional as applied to Berwind.[30]
 
 VIII. CONCLUSION
 
 86
 Because we hold that the Coal Act is constitutional as applied to Berwind, we will reverse the district court's grant of summary judgment to Berwind on its APA claim (Count V) and its common law claim for restitution. We will affirm the district court's grant of summary judgment to the defendants on Berwind's claims that the Coal Act is unconstitutional as applied and unconstitutional in its entirety (Counts I, II and III). Accordingly, the district court correctly granted summary judgment in favor of defendants on Berwind's claim for a premium refund under the Coal Act (Count IV), its claim for a premium refund under ERISA (Count VII) as well as its claim for a tax refund against the United States (Count VIII).
 
 
 
 Notes:
 
 
 [1]
 See also our discussion in Shenango Inc. v. Apfel, No. 00-2525, 307 F.3d 174 (3d Cir. 2002).
 
 
 [2]
 The Combined Fund and the 1992 Plan are two of three components formulated by Congress to achieve the purposes of the Coal Act. The second component is the mandated continuation of individual employer health plans maintained by signatories to the 1978 and later NBCWAs. 26 U.S.C. § 9711. It is not implicated in these appeals
 
 
 [3]
 The BCOA is a multiemployer group of coal producers
 
 
 [4]
 Originally, the Coal Act provided that the Secretary of Health and Human Services would be responsible for the assignment of Combined Fund beneficiaries. The Secretary delegated this task to the Commissioner of Social Security. In 1994, Congress transferred the statutory responsibility directly to the Commissioner. See Social Security Independence and Program Improvements Act of 1994, Pub.L.No. 10-3-296, §§ 105(a)(2)(A), 108(h)(9)(A), 108 Stat. 1472, 1487-88 (1994)
 
 
 [5]
 Inasmuch as it is a fair generalization to assume that practically all miners during the relevant period were male, we will use the masculine pronoun throughout
 
 
 [6]
 We have, however, held that the Commissioner did not lose authority to make such assignments after October 1, 1993See Shenango Inc. v. Apfel, No. 00-2525, 307 F.3d 174 (3d Cir.2002).
 
 
 [7]
 The New River and Pocahontas Consolidated Coal Company ("New River") operated mines in West Virginia and employed UMWA-represented miners until 1961. New River merged into Berwind-White in September, 1964. New River was a signatory to the 1959 NBCWA, and the 1951, 1952, and 1955 amendments thereto
 
 
 [8]
 As we have noted, the Commissioner plays no part in the assignment of 1992 Plan Beneficiaries
 
 
 [9]
 Berwind claims that since the inception of its liability under the Coal Act, it has paid $16,779,414 in premiums to the Combined Fund and $36,386 in premiums to the 1992 Plan. In June 1998, Berwind calculated the pre-tax, net present value of its total future liability under the Coal Act to be approximately $24.5 million. Actuarial projections show that Berwind will be liable for Coal Act premiums until approximately the year 2040. Amended Complaint, at ¶¶ 14, 15, 18 (App. at 124)
 
 
 [10]
 See n.4 supra.
 
 
 [11]
 Coal Act assignments operate retroactively because they require an assignee to use current funds to provide benefits for miners after the assignee believed its liability to the miners had been settledSee Eastern Enterprises, at 534, 118 S.Ct. 2131 (O'Connor, J.) ("[T]he Coal Act operates retroactively, divesting Eastern of property long after the company believed its liabilities under the 1950 W & R Fund to have been settled.").
 
 
 [12]
 The Court decidedEastern on June 24, 1998, twenty-two months after it denied certiorari in Berwind I.
 
 
 [13]
 The district court, believing that the "1992 Plan assignments ... are made in precisely the manner as Combined Fund assignments....," 94 F.Supp.2d at 608 n. 10, regarded the APA claim as dispositive of the 1992 Plan. However, as noted earlier, the Coal Act allocates financial responsibility for the 1992 Plan in a manner completely different from the Combined Fund. The Commissioner plays no part in assigning beneficiaries to the 1992 Plan. In fact, beneficiaries are not even "assigned" to the 1992 Plan. Rather, the last signatory operator of each 1992 Plan beneficiary is automatically responsible for the beneficiary's health care premium. 26 U.S.C. § 9712(d)(1)(b), (3). Moreover, Berwind never asked for any relief against the 1992 Plan
 
 
 [14]
 Berwind does not contest the district court's dismissal of its claim that the entire Coal Act is unconstitutional. The Commissioner and the Trustees claim that as a result ofTempleton Coal Co. v. Shalala, Berwind's as applied constitutional challenge is barred by the doctrine of res judicata. The Trustees also claim that Berwind's common law restitution claim for premiums paid is similarly barred by res judicata because it is premised on the as applied unconstitutionality of the Coal Act. Berwind responds by arguing that its as applied challenge and its restitution claim are not barred by res judicata because they are based on causes of action that arose after the district court in Berwind I dismissed its constitutional challenge to the assignments. In Berwind's view, each new assessment of premium liability subsequent to the district court's decision in Berwind I constitutes a new cause of action.
 We do not believe that we are required to resolve this issue. "[R]es judicata is an affirmative defense and not a doctrine that would defeat subject matter jurisdiction of this court." Rycoline Products, Inc. v. C & W Unlimited, 109 F.3d 883, 886 (3d Cir.1997) (quoting Livera v. First Nat'l Bank of New Jersey, 879 F.2d 1186, 1190 (3d Cir.1989)). Therefore, we can proceed to the merits of the as applied constitutional challenge and the common law restitution claim without violating the Supreme Court's prohibition against assuming "hypothetical jurisdiction" to reach the merits of a claim. Steel Company v. Citizens for a Better Environment, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The Commissioner does not claim that Berwind's APA claim is barred by res judicata. Yet, as explained below, see n. 15, infra, determining whether the Commissioner violated the APA requires the same inquiry that we would have to undertake to determine if the Coal Act is unconstitutional as applied to Berwind.
 
 
 [15]
 Procedurally, these appeals are here as a result of the district court's grant of summary judgment. Thus, our standard of review would be plenaryFertilizer Institute v. Browner, 163 F.3d 774, 777 (3d Cir.1998). However, we review the Commissioner's action as final agency action under the APA to determine if the administrative decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." Anker Energy Corp. v. Consolidation Coal Co., 177 F.3d at 169 (quoting 5 U.S.C. S 706(A)(2)). The district court's decision to grant equitable restitution to Berwind is subject to an abuse of discretion standard of review, so long as we agree with the district court's legal conclusions. See Bechtel v. Robinson, 886 F.2d 644, 647 (3d Cir.1989). However, because the district court granted equitable restitution to Berwind after it found that the Commissioner violated the APA by not voiding Berwind's Combined Fund beneficiary assignments in light of Eastern Enterprises, we must also determine if Berwind is in a substantially identical position to the plaintiff in Eastern Enterprises. That inquiry is the same inquiry that would be undertaken in determining the constitutionality of the Coal as applied to Berwind. Thus, our standard of review is de novo. Anker Energy Co. v. Consolidation Coal Co., 177 F.3d at 169.
 
 
 [16]
 We also held inUnity Real Estate that because of the concurrence and dissent in Eastern Enterprises, "we are bound to follow the five-four vote against the takings claim...." 178 F.3d at 659; see also Anker Energy Corp., at 170 n. 3. Therefore, Berwind's challenge is on substantive due process grounds.
 
 
 [17]
 A bankruptcy court subsequently granted it leave to reject the 1981 NBCWA
 
 
 [18]
 To achieve that end, King Knob signed "me too" agreements in 1974, 1978, 1981 and 1984. A "me too" agreement is an agreement whereby an employer who is not a member of the BCOA agrees with the UMWA to be bound by the terms of the NBCWAAnker Energy, at 166-167. A "me too" agreement has terms identical to the terms of a NBCWA and there is no distinction regarding an employer's contractual rights and obligations. Id. at 172 n. 4. Thus, the distinction between a NBCWA signatory and a "me too" signatory is without a difference. Id.
 
 
 [19]
 The Coal Act provides that if an assigned operator believes that it has been erroneously assigned beneficiaries, the operator can obtain information about the beneficiaries from the Commissioner and seek review of the assignments. 20 C.F.R. § 9706(f); see also 20 C.F.R. §§ 422.601-607. The burden is on the assigned operator to make out a prima facie case that the assignments were in error. See 20 C.F.R. § 422.605. If the Commissioner finds that the assignments were in error, he can declare them void and reassign the beneficiaries to the appropriate signatory operator or related person. 26 U.S.C. § 9706(f)(3)(A). If the Commissioner finds that the assignments are not in error, he must notify the assigned operator. The Commissioner's determination is final. 26 U.S.C. § 9706(f)(3)(B)
 
 
 [20]
 Although the plurality's cautionary note that legislation might be unconstitutional if it is severely retroactive and substantially disproportionate was made in the course of its Takings Clause analysis, the admonition is applicable to a substantive due process analysis as well. As the plurality noted inEastern, "[o]ur analysis of legislation under the Takings and Due Process Clauses is correlated to some extent." 524 U.S. at 537, 118 S.Ct. 2131 (plurality) (citing Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 223, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986)).
 
 
 [21]
 The Coal Act was passed in 1992 and South Union-WVA, Unity's related person, last signed a NBCWA in 1981
 
 
 [22]
 InUnity, we relied on Justice Kennedy's "explication of the relevant due process principles because the plurality did not reach Eastern's due process claim." 178 F.3d at 670 n. 13.
 
 
 [23]
 Eastern Enterprises' estimated liability was between $50 and $100 million. 524 U.S. at 529, 118 S.Ct. 2131. Unity alleged that its estimated Coal Act liabilities were over six times its total assets and that if the assignments were upheld, it would be bankrupted. 178 F.3d at 655. At the time Unity's appeal was before us, Unity's total payments were under $1 millionId. at 671.
 
 
 [24]
 A statute will not violate substantive due process where the burden imposed is "proportional to the harm legitimately addressed by the legislature."Unity, at 671. Thus, a statute is not unconstitutional "if the liability actually imposed is not out of proportion to the claimant's prior experience with the object of the legislation." Id. at 672. "Prior experience can consist of conduct that creates reasonable expectations about the object of the legislation or conduct that creates the problems that impelled the legislature to act." Id.
 
 
 [25]
 Ironically, given Berwind's structural evolution and network of changing affiliates and names, it could be argued that Berwind's involvement in the coal industry reflects precisely the kind of "corporate shell game" that Congress was concerned about when it enacted the Coal Act
 
 
 [26]
 InAnker Energy, we applied that same level of substantive due process analysis to the Commissioner's assignments to Anker. Anker's related person had agreed to post-1974 NBCWAs, and we upheld the challenged assignments. 177 F.3d at 172-173.
 
 
 [27]
 Because it never mined coal and never signed a coal wage agreement, we can assume that Unity was never a member of the BCOA
 
 
 [28]
 Out of a total of 63 Combined Fund beneficiaries assigned to Unity Real Estate, only 10 had worked for the post-1974 signatory, South Union-WVAId. The remaining 53 beneficiaries assigned had worked for the various pre-1974 signatories.
 
 
 [29]
 We realize that Berwind was originally assigned Combined Fund liability for more than 1,900 of its former employees to whom it never made a promise of lifetime health benefits. However, despite that apparent numerical disproportionality, it is clear underUnity that the Constitution is not a bar to the assigning Berwind responsibility for all of the miners under the "controlled group" provisions of the Coal Act.
 
 
 [30]
 After this case was argued, the Supreme Court decidedBarnhart v. Sigmon Coal Co., 534 U.S. 438, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). That case involved a question of statutory construction centering on whether the Coal Act permits the Commissioner to assign retired miners to successors in interest of out-of-business signatory operators. That question is not presented here, and Barnhart therefore has no bearing on the issue presented in these consolidated appeals.