# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2010AP2363-CR & 2010AP2364-CR |
| COMPLETE TITLE: | State of Wisconsin, Plaintiff-Respondent, v. Richard Lavon Deadwiller, Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 343 Wis. 2d 703, 820 N.W.2d 149
(Ct. App. 2012 – Published)
PDC No: 2012 WI App 89

| | |
|---|---|
| OPINION FILED: | July 16, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 10, 2013 |

| SOURCE OF APPEAL: | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Patricia D. McMahon |

| JUSTICES: | |
|---|---|
| CONCURRED: | ABRAHAMSON, C.J., concurs. BRADLEY, J., concurs with Part I.(Opinion filed). BRADLEY, J., concurs with Section III.B of majority opinion. (Opinion filed.) |
| DISSENTED: | |
| NOT PARTICIPATING: | GABLEMAN, J., did not participate. |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs by *Mark S. Rosen* and *Rosen and Holzman, Ltd.*, Waukesha, and oral argument by *Mark S. Rosen*.

For the plaintiff-respondent, there was a brief by *Maura FJ Whalen*, assistant attorney general, and *J.B. Van Hollen*, attorney general. The cause was argued by *Warren D. Weinstein*, assistant attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2010AP2363-CR & 2010AP2364-CR
(L.C. No.   2007CF4140 & 2007CF4858)

STATE OF WISCONSIN                :        IN SUPREME COURT

**State of Wisconsin,**

   **Plaintiff-Respondent,**

   **v.**

**Richard Lavon Deadwiller,**

   **Defendant-Appellant-Petitioner.**

**FILED**

**JUL 16, 2013**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1    ANNETTE KINGSLAND ZIEGLER, J.    This is a review of a published decision of the court of appeals,[1] which affirmed judgments of conviction entered by the Milwaukee County Circuit Court, Judge Patricia D. McMahon, after a jury found Richard Lavon Deadwiller (Deadwiller) guilty of two counts of second-degree sexual assault by use of force, contrary to Wis. Stat. § 940.225(2)(a) (2005-06).[2]   During Deadwiller's trial, Wisconsin

---

   [1] State v. Deadwiller, 2012 WI App 89, 343 Wis. 2d 703, 820 N.W.2d 149.

   [2] All subsequent references to the Wisconsin Statutes are to the 2005-06 version unless otherwise indicated.

State Crime Lab analyst Ronald G. Witucki (Witucki) testified that an out-of-state lab, Orchid Cellmark (Orchid), analyzed vaginal and cervical swabs taken from the two victims, Kristina S. and Chantee O. Orchid produced DNA profiles of semen found on the victims' swabs. After receiving the DNA profiles from Orchid, Witucki entered the DNA profiles into the DNA database, which resulted in a match to Deadwiller. No one from Orchid testified at Deadwiller's trial. The jury convicted Deadwiller of two counts of second-degree sexual assault by use of force. Deadwiller appealed, arguing that his right to confrontation was violated when the circuit court allowed Witucki to rely on the DNA profiles produced by Orchid. The Confrontation Clause prohibits the introduction of testimonial hearsay of a witness who is absent from trial unless the witness is unavailable and the defendant had the prior opportunity to cross-examine the witness. Crawford v. Washington, 541 U.S. 36, 51, 59 (2004). The court of appeals affirmed, concluding that Deadwiller's right to confrontation was not violated because the DNA profiles produced by Orchid were not testimonial under Williams v. Illinois, 567 U.S. ___, 132 S. Ct. 2221 (2012). State v. Deadwiller, 2012 WI App 89, ¶14, 343 Wis. 2d 703, 820 N.W.2d 149. We affirm the court of appeals.

¶2 We conclude that on the facts of this case, Witucki's testimony did not violate Deadwiller's right to confrontation. Applying the various rationales of Williams, a majority of the United States Supreme Court would come to the same conclusion as in Williams, that the expert's testimony did not violate the

2

defendant's right to confrontation.   Moreover, Deadwiller did not challenge the substance of Witucki's testimony because his defense was that the intercourse did occur but that the victims consented.

¶3   Further, assuming <u>arguendo</u> that the admission of Witucki's testimony violated Deadwiller's right to confrontation, we conclude that the error was harmless in light of the defendant's previous admissions of sexual intercourse with the victims and the fact that throughout the proceedings, he maintained a defense that the victims consented.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶4   On August 27, 2007, Deadwiller was charged with one count of second-degree sexual assault by use of force in violation of Wis. Stat. § 940.225(2)(a).   The complaint alleged that on July 12, 2006, Deadwiller sexually assaulted Kristina S. by striking her in the head, forcing her to the ground, and forcing her to have sexual intercourse.   On October 4, 2007, Deadwiller was charged in a separate case with one count of second-degree sexual assault by use of force contrary to Wis. Stat. § 940.225(2)(a).   The complaint alleged that on August 12, 2006, Deadwiller sexually assaulted Chantee O. by grabbing her from behind, punching her in the jaw, forcing her to the ground, and forcing her to have sexual intercourse.[3]

---

[3] The case involving Kristina S. was assigned circuit court case number 2007CF4140.   The case involving Chantee O. was assigned circuit court case number 2007CF4858.   On October 25, 2007, the circuit court granted the State's motion to consolidate the cases.

¶5 On March 26, 2008, the State filed a motion in limine seeking a ruling that the testimony of Witucki would be admissible at trial. The motion confirmed that Witucki was not the analyst who developed the DNA profiles from the semen recovered on the victims' vaginal and cervical swabs. However, Witucki entered Orchid's DNA profiles into the DNA database and obtained a match to Deadwiller. Thereafter, Witucki received a buccal (cheek) swab from Deadwiller and compared the new sample to the Orchid DNA profiles, again resulting in a match. The State argued that Witucki independently concluded that Deadwiller was a match for the DNA recovered from the victims and that "[a] defendant's confrontation right is satisfied if a qualified expert testifies as to his or her own independent opinion, even if the opinion is based in part on the work of another." State v. Barton, 2006 WI App 18, ¶20, 289 Wis. 2d 206, 709 N.W.2d 93 (citing State v. Williams, 2002 WI 58, ¶¶9, 11, 253 Wis. 2d 99, 644 N.W.2d 919).[4] Deadwiller opposed the State's motion, arguing that he was entitled to confront the Orchid analysts who completed the DNA profiles on the victims' swabs. The circuit court ruled that under Barton and State v. Williams, Witucki would be permitted to testify about the DNA results, assuming the proper foundation and credentials were presented.

---

[4] In this case, we rely on two different cases with the name "Williams": Williams v. Illinois, 567 U.S. ___, 132 S. Ct. 2221 (2012), and State v. Williams, 2002 WI 58, 253 Wis. 2d 99, 644 N.W.2d 919. As Williams v. Illinois is much more important to our analysis, it will be referred to as "Williams." We refer to the other case as "State v. Williams."

¶6 In preparation for trial, Deadwiller hired an expert to review the DNA evidence in this case, and the trial was delayed several times because Deadwiller's expert had not completed his analysis. At a pretrial conference on March 26, 2008, Deadwiller reported that he wanted to go forward with the trial even though he had not received the expert's analysis. The circuit court confirmed that Deadwiller wanted to proceed to trial without his expert:

> THE COURT: The question is do you want to go to trial and waive your right, give up your right to have this expert who is working on some information, or shall we set another date so your expert can complete the work he started. . . .
>
> THE DEFENDANT: I want to go to trial.
>
> THE COURT: You want to go to trial on Monday without an expert.
>
> THE DEFENDANT: Yes.

The State then added that Deadwiller's decision was reasonable because "Deadwiller's made statements admitting sexual intercourse. . . . It's going to be in my view a credibility case, so I think this is a reasonable decision if he wants a speedy trial." Deadwiller agreed with the prosecutor that the main issue in the case was whether the women consented or whether he forced them to have intercourse: "I agree with [the prosecutor] 100 percent." In other words, even before the trial began, Deadwiller's defense was that the women consented to the intercourse. He did not challenge that his DNA was found in the victims.

5

¶7   On April 7, 2008, Deadwiller's jury trial began.  The jury heard testimony from Kristina S., Chantee O., a sexual assault nurse, several police officers, Witucki, and Deadwiller. Kristina S. testified that on July 12, 2006, she had an argument with her boyfriend, left the apartment where they had been staying, and was locked out.  Kristina S. testified that she walked to a nearby gas station to call her boyfriend to let her back into the apartment but was unable to reach him.  Walking back towards the apartment, Kristina S. testified that Deadwiller began talking to her and offered to let her use the phone at his house.  She testified that she walked with him until they approached a dark alley, at which point she stopped. She then testified that Deadwiller grabbed her arm, hit her in the face, told her to take her pants down, threatened to kill her if she refused, then forced her to have sexual intercourse. Kristina S. testified that she immediately reported the crime, went to the Sexual Assault Treatment Center at Aurora Sinai Hospital, and underwent a sexual assault examination.  Kristina S. testified that she did not consent to having sex with Deadwiller, nor did she agree to have sex with Deadwiller in exchange for money or drugs.  Rather, she testified that "he raped me."

¶8   Chantee O. testified that on August 12, 2006, she was walking on the 16th Street bridge in Milwaukee and was going to catch a bus home.  She testified that three people, including Deadwiller, were waiting for the bus on the opposite side of the street.   According   to   Chantee   O.'s   testimony,   Deadwiller

informed her that her bus stop was down a set of stairs and that he would show her where it was located. Chantee O. testified that Deadwiller led her a short way from the bottom of the stairs, hit her in the jaw, told her to take down her pants, then forced her to have sexual intercourse. Chantee O. testified that immediately after the assault, she flagged down a police car, went to the Sexual Assault Treatment Center at Aurora Sinai Hospital, and underwent a sexual assault examination. Similar to Kristina S., Chantee O. testified that she did not have sex with Deadwiller voluntarily nor did she have sex in exchange for drugs or money.

¶9 The State then called several witnesses to establish a chain of custody for the evidence collected during the victims' sexual assault examinations. Tanya Wieland, a sexual assault nurse examiner at Aurora Sinai, testified that she conducted the examination on both victims, packaged and labeled all of the evidence collected, including vaginal and cervical swabs, and turned the evidence over to hospital security, which keeps evidence in a secure room until picked up by the police. Two officers testified that they picked up the evidence collected from Kristina S. and Chantee O. from the secure room at Aurora Sinai, opened the outer bag (without opening the bags on the individual items) to inventory the evidence, and turned over the evidence to the police department's property control section. Detective Lori Gaglione then testified that the items of evidence were transported from the property control section to the State Crime Lab (SCL), which gives a receipt when evidence

is submitted.  Gaglione testified that in both cases, the case number on the SCL receipt corresponded to the case number on the police inventory sheet.

¶10 Witucki then testified regarding the DNA evidence, including that, in his opinion, DNA recovered from the victims matched Deadwiller.  He testified to his qualifications, including 20 years of working at the SCL, degrees in technology and biology, and training in forensic serology, semen identification techniques, and DNA typing methods.  Witucki testified that the SCL had a contract with Orchid to reduce the backlog of DNA case work, whereby the SCL sent evidence to Orchid, which ran the necessary testing and sent back results for the SCL to review.  Witucki testified that he was familiar with Orchid's protocols because it was accredited by the same agency that accredited the SCL and Orchid submitted its protocols when it first applied for the contract with the SCL.

¶11 The SCL received evidence in Kristina S.'s case in July 2006 and evidence in Chantee O.'s case in August 2006. Between the time the SCL receives the evidence and the time it is sent to Orchid, Witucki testified that the evidence is individually sealed and stored in a freezer or evidence control room.  The SCL sent samples to Orchid in Kristina S.'s case in April 2007 and Chantee O.'s case in November 2006.  The SCL received samples from Orchid in Kristina S.'s case on July 5, 2007, and Chantee O.'s case on July 6, 2007.  Witucki testified that the SCL follows protocols and maintains records of evidence by assigning a case number upon receipt of evidence, storing the

8

evidence in a control room or freezer, and recording the shipping labels if evidence is sent to an out-of-state lab.[5]

¶12 Witucki testified that he received a "report and all the electrophoreticgrams[6] and the necessary documentation" from Orchid with respect to both victims, and that he personally completed all of the work on the cases after the SCL received the reports from Orchid.  Witucki testified that the case number on the documentation received from Orchid corresponded to the SCL case numbers for Kristina S. and Chantee O.  Upon receipt of Orchid's report, Witucki testified that he analyzed both cervical swabs and determined that there was a foreign male DNA profile present in both swabs.  Witucki testified that he "check[ed] to see that [Orchid] followed their procedures, that their quality control measures were followed, [and] they got

---

[5] In addition to witness testimony, the State introduced exhibits documenting how the evidence for both victims was collected through the testimony of the sexual assault nurse, was transferred from the hospital to the police station through the testimony of the police officers, and was submitted to the SCL through the testimony of the police officers and Witucki.  The State did not submit shipping labels showing how the evidence was sent to Orchid and returned to the SCL.  However, Witucki testified to the SCL's protocols for maintaining the chain of custody through shipping label manifests and testified that the case numbers on documentation received from Orchid corresponded to the SCL case numbers for Kristina S. and Chantee O.

[6] The jury trial transcript uses the spelling "electrophoreticgram," although reference sources present it as an "electrophoretogram" which is "[a] record of the results of an electrophoresis."  The American Heritage Dictionary of the English Language 594 (3d ed. 1992).  "Electrophoresis," in turn, is "[a] method of separating substances, especially proteins, and analyzing molecular structure."  Id.

acceptable results on their control values." He testified that he "evaluate[d] the electrocphoreticgrams, [sic] which is the end product or the typing results from the evidence, and we determine if it's of sufficient quality for entry into our local DNA data base." Witucki testified that he entered the DNA profiles from Orchid into the DNA database, which returned a result that DNA recovered from both victims matched each other and matched Deadwiller. Once the match was returned, Witucki testified that he checked that the profiles were entered correctly into the database and personally confirmed that the DNA profiles matched. He then testified that a computer match is not conclusive proof, but "investigative information." Thereafter, the police obtained a buccal swab from Deadwiller, and Witucki testified that he "develop[ed] a DNA profile from those buccal swabs, then compare[d] them to the profiles that were generated by Orchid Cellmark from the cervical swabs of Chantee O. and vaginal swabs of Kristina S." Witucki concluded that there was a match:

> State:    Did you reach an opinion to a reasonable degree of scientific certainty with respect to whether or not Mr. Deadwiller was the source of the male DNA found in [Chantee O.'s] cervical swabs?
>
> Witucki:  Yes, I did.
>
> State:    What is your opinion?
>
> Witucki:  Well, they matched all 13 genetic locations that we test for; and I ran a statistical calculation on that profile, and it was of a sufficient number that allowed me to determine in my opinion that the semen found

10

> on the cervical swabs of Chantee O. originated from Richard Deadwiller.
>
> . . . .
>
> State:    With respect to Kristina S., did you compare the DNA profile that you developed from Richard Deadwiller with the foreign DNA found on her vaginal swabs?
>
> Witucki:  Yes, I did.
>
> State:    Do you know what the source of that foreign male DNA found on her vaginal swabs was?
>
> Witucki:  Again, as in Chantee O.'s case, for the profile developed from the vaginal swabs of Kristina S., there was a match [for] all 13 genetic locations; and I ran a statistical calculation and that allowed me to determine that in my opinion, it was a high enough number that Richard Deadwiller was the source of the semen . . . .

None of the documentation completed by Orchid was introduced into evidence. The State rested its case after Witucki's testimony.

¶13 Deadwiller testified in his defense. In his version of the events, both women offered to have sex with him for money and consented to having sex with him. He testified that Kristina S. may have had motivation to lie because she tried to run away from him after he paid Kristina S. upfront, and he "slapped her on the side of the head like to stop her and she fell." Further, he testified that Chantee O. may have had motivation to lie because he paid her only $10 after they had agreed on a price of $15.

¶14 The jury found Deadwiller guilty on both counts. Deadwiller was sentenced to 20 years' imprisonment on each

count, consisting of 15 years of confinement and 5 years of extended supervision for each count.

¶15 Deadwiller appealed, arguing that "the trial court violated his right to confrontation by allowing a technician from the Wisconsin State Crime Laboratory to rely on a scientific report that profiled the DNA left on the victims by their attacker." Deadwiller, 343 Wis. 2d 703, ¶1.  The court of appeals affirmed the conviction, and it relied on the recent United States Supreme Court case of Williams, which presented very similar facts to Deadwiller's case.  Id., ¶¶8, 14.  Though Williams is a fractured opinion, "five justices agreed at the core that the outside laboratory's report was not testimonial." Id., ¶12.  The court of appeals declined to adopt exclusively any of the three rationales presented, stating that it was "bound by the judgment in Williams."  Id., ¶14.

¶16 Deadwiller petitioned this court for review, and we granted his petition on January 14, 2013.

## II. STANDARD OF REVIEW

¶17 The question presented in this case is whether Deadwiller's right to confrontation was violated by Witucki's use of the DNA profiles developed by Orchid.  While "a circuit court's decision to admit evidence is ordinarily a matter for the court's discretion, whether the admission of evidence violates a defendant's right to confrontation is a question of law subject to independent appellate review."  State v. Williams, 253 Wis. 2d 99, ¶7 (citing State v. Ballos, 230 Wis. 2d 495, 504, 602 N.W.2d 117 (Ct. App. 1999)).

12

## III. ANALYSIS

¶18 We conclude that on the facts of this case, Witucki's testimony did not violate Deadwiller's right to confrontation. Applying the various rationales of Williams, a majority of the United States Supreme Court would come to the same conclusion as in Williams, that the expert's testimony did not violate the defendant's right to confrontation. Moreover, Deadwiller did not challenge the substance of Witucki's testimony because his defense was that the intercourse did occur but that the victims consented.

¶19 Further, assuming arguendo that the admission of Witucki's testimony violated Deadwiller's right to confrontation, we conclude that the error was harmless in light of the defendant's previous admissions of sexual intercourse with the victims and the fact that throughout the proceedings, he maintained a defense that the victims consented.

### A. Confrontation Clause

¶20 The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In Crawford, the Court held that the Confrontation Clause permitted the admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59. The Court stated that "witnesses" against the defendant are "those who bear testimony." Id. at 51. The Court defined "testimony" as

13

"a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. The Confrontation Clause is concerned with "a specific type of out-of-court statement," such as affidavits, depositions, custodial examinations, prior testimony, and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52.

¶21 After Crawford, a flurry of Confrontation Clause jurisprudence has ensued over what constitutes a "testimonial statement."[7] The Court recently decided Williams, which is

---

[7] The State and Deadwiller disagree about the application of two recent U.S. Supreme Court decisions on the Confrontation Clause: Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), and Bullcoming v. New Mexico, 564 U.S. __, 131 S. Ct. 2705 (2011). The State argues that both cases are distinguishable, and Deadwiller argues that both are controlling. In Melendez-Diaz, at the defendant's trial for distribution of cocaine, prosecutors introduced into evidence three notarized "certificates of analysis" indicating that test results revealed the distributed substance to be cocaine. 557 U.S. at 308. No analyst testified. Id. at 309. In a straightforward application of Crawford v. Washington, 541 U.S. 36 (2004), the Court held that the certificates were testimonial because they were "quite plainly affidavits" and were "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 310. Indeed, "the sole purpose of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." Id. at 311.

14

factually similar to Deadwiller's case.[8]  See infra, ¶32.  In that case, Williams was charged with aggravated sexual assault of a woman, L.J.    Williams, 567 U.S. ___, 132 S. Ct. at 2229. After the assault, L.J. reported the attack, went to the hospital, and underwent a sexual assault examination.  Id.  The

_____

In  Bullcoming,  at  the  defendant's  DWI  trial,  the prosecution introduced into evidence a crime lab report completed by Curtis Caylor certifying that, shortly after the traffic accident involving the defendant, Bullcoming's blood-alcohol concentration (BAC) was 0.21 grams per hundred milliliters.   564 U.S. at __, 131 S. Ct. at 2711-12.   The prosecution did not call Caylor as a witness because he had been placed "on unpaid leave," but instead, called Gerasimos Razatos, who had not participated in or supervised Caylor's work nor did Razatos have an independent opinion about Bullcoming's BAC.  Id. at 2715-16.   The Court held that Razatos's substitute testimony did not satisfy the requirements of the Confrontation Clause because the report contained more than machine generated results (for example, that Caylor received the blood sample with the seal intact and that Caylor followed a particular protocol), and that under Melendez-Diaz, the report was testimonial because it was formalized and created solely for an evidentiary purpose. Id. at 2715-17.

[8] Both cases involve sexual assault.  In both cases, the victim underwent a sexual assault examination, which produced vaginal swabs containing DNA of the perpetrator.   Police officers in both cases retrieved the evidence, inventoried the evidence, and sent the evidence to the state crime lab, which then sent the evidence to an out-of-state laboratory for DNA testing.   Further, the out-of-state laboratories sent back the swabs and a DNA profile of the perpetrator produced from the vaginal swabs.  In both cases, state crime lab analysts entered the DNA profile into a DNA database, which resulted in a match to the defendant.  When called to testify, the state crime lab analysts reported that the DNA profile sent by the out-of-state lab matched the DNA profile resulting from the DNA database. The DNA profile was not introduced into evidence in either case. Prosecutors in both cases introduced inventory reports and evidence receipts to prove a chain of custody, i.e. that the DNA profile was produced from swabs taken from the victims.

police picked up the evidence collected from L.J., labeled the evidence with an inventory number, and sent it under seal to the state crime lab. Id. The crime lab sent the evidence to a Cellmark Diagnostics Laboratory in Maryland. Id. Cellmark sent back L.J.'s swabs and a "report containing a male DNA profile produced from semen taken from those swabs." Id. Williams was not under suspicion at the time Cellmark completed its analysis. Id. Sandra Lambatos, a forensic specialist at the Illinois state crime lab, entered Cellmark's DNA profile into the state DNA database, resulting in a match to Williams. Id.

¶22 Williams was charged with, inter alia, aggravated sexual assault and was tried before a state judge. Id. Lambatos testified that it was common for "one DNA expert to rely on the records of another DNA expert," that Cellmark was an "accredited crime lab," that the state crime lab often sent genetic samples to Cellmark to reduce its backlog, and that the state crime lab employees relied on the sealed shipping containers and shipping manifests to preserve the chain of custody. Id. at 2229-30. Lambatos was shown shipping manifests and "explained what they indicated, namely, that the [state crime lab] had sent L.J.'s vaginal swabs to Cellmark, and that Cellmark had sent them back, along with a deduced male DNA profile." Id. at 2230. The prosecutor asked Lambatos whether there was a computer match between "the male DNA profile found in semen from the vaginal swabs of [L.J.]" and the "male DNA profile that had been identified" from Williams' blood. Id. Over the defendant's objection, Lambatos testified that based on

16

her comparison of the two DNA profiles, there was a match. Id. The prosecutor did not enter the Cellmark report into evidence, nor did Lambatos read from or identify the report as the source of any of her conclusions. Id. On cross-examination, Lambatos confirmed that she did not conduct or observe any testing on the vaginal swabs, and that her testimony relied on Cellmark's DNA profile. Id. She testified that she trusted Cellmark's work because it was an accredited lab and that it was unlikely the samples had been degraded or compromised because the state crime lab checked for degradation before sending the samples to Cellmark and the samples would have exhibited telltale signs had they degraded. Id. at 2230-31. Williams moved to exclude parts of Lambatos' testimony based on the Confrontation Clause, but the judge did not exclude the evidence because Lambatos' opinion "was based on her own independent testing of the data received from [Cellmark]." Id. at 2231. The judge found Williams guilty, and his conviction was affirmed by the state court of appeals and supreme court. Id.

¶23 The United States Supreme Court affirmed in a fractured opinion, concluding for various reasons that Lambatos' testimony did not violate Williams' right to confrontation. Id. at 2228, 2255. Justice Alito wrote for the lead opinion, which was joined by Chief Justice Roberts, Justice Kennedy, and Justice Breyer. Id. at 2227. Justice Thomas concurred in the result, but not in the lead opinion's reasoning. Id. at 2255. Justice Alito gave two rationales to support his conclusion. First, he reasoned that the DNA profile was not used to prove

17

the truth of the matter asserted, namely, that "the report contained an accurate profile of the perpetrator's DNA."  Id. at 2240.   Williams argued that Lambatos' testimony violated his right to confrontation because she lacked personal knowledge that Cellmark's DNA profile was produced from the vaginal swab of the victim, L.J.   Id. at 2236.   Justice Alito rejected this argument, stating that under the Illinois and Federal Rules of Evidence,[9] Lambatos' testimony was not admissible for the purpose of proving that the DNA profile was produced from L.J.'s vaginal swab.   Id.   Nor did the record support Williams' argument that the fact finder relied on Lambatos' testimony for the truth of the matter.   Further, Justice Alito rebutted the dissent's argument that even if the report itself was not put into evidence, Lambatos testified to the substance of the report, and without the report, the State had insufficient evidence to prove that Cellmark's DNA profile was based on L.J.'s swab and that Cellmark's analysis was reliable.   Id. at 2238.   Justice Alito

---

[9] See Fed. R. Evid. 703:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

See also Wis. Stat. § 907.03.

reasoned that the state put in traditional chain of custody evidence to prove that Cellmark's DNA profile was based on L.J.'s swab. Id. at 2237, 2239. Further, Justice Alito reasoned that it was simply improbable that shoddy lab work would result in the DNA profile of Williams, especially where Williams was not under suspicion at the time of Cellmark's testing. Id. at 2239.

¶24 Justice Alito explained that his rationale was consistent with Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), and Bullcoming v. New Mexico, 564 U.S. __, 131 S. Ct. 2705 (2011). Id. at 2240. In both of those cases, the forensic report was introduced for the truth of what they asserted, that Bullcoming's BAC exceeded the legal limit and that the substance Melendez-Diaz was charged with distributing was cocaine. Id. In contrast, Cellmark's report was not used for the truth of the matter:

> In this case, the Cellmark report was not introduced into evidence. An expert witness referred to the report not to prove the truth of the matter asserted in the report, i.e., that the report contained an accurate profile of the perpetrator's DNA, but only to establish that the report contained a DNA profile that matched the DNA profile deduced from petitioner's blood. Thus, . . . the report was not to be considered for its truth but only for the distinctive and limited purpose of seeing whether it matched something else. The relevance of the match was then established by independent circumstantial evidence showing that the Cellmark report was based on a forensic sample taken from the scene of the crime.

Id. at 2240-41 (citation omitted).

19

¶25 Justice Alito then explained a second, independent rationale for concluding that Lambatos' testimony did not violate Williams' right to confrontation.  Id. at 2242.  He explained that the Confrontation Clause refers to "witnesses against" the accused, and that in post-Crawford cases, there were two common characteristics of Confrontation Clause violations: "(a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions."  Id.  In Williams, the Cellmark report was not "prepared for the primary purpose of accusing a targeted individual."  Id. at 2243.  Rather, "its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time."  Id.

¶26 Justice Thomas concurred in the judgment, but he disagreed with Justice Alito's reasoning.  Id. at 2255.  Justice Thomas reached his conclusion "solely because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause":

> In Crawford, the Court explained that '[t]he text of the Confrontation Clause . . . applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'' 'Testimony,' in turn, is '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' In light of its text, I continue to think that the Confrontation

20

Clause regulates only the use of statements bearing 'indicia of solemnity.'

Id. at 2255, 2259-60 (quoting Crawford, 541 U.S. at 51 (internal citations omitted)).  Justice Thomas concluded that Cellmark's report did not meet this standard because it lacked the solemnity of an affidavit or deposition.  Id. at 2260.  The report was "neither a sworn nor a certified declaration of fact."  Id.  Even though the report was produced at the request of the police, "it was not the product of any sort of formalized dialogue resembling custodial interrogation."  Id.

¶27  Thus, although Williams was a fractured opinion, five Justices concluded that Lambatos' testimony did not violate Williams' right to confrontation.  Id. at 2228, 2255.

¶28  Deadwiller argues that his right to confrontation was violated when the circuit court allowed Witucki to rely on the DNA profiles created by Orchid.  He argues that Orchid's DNA profiles were testimonial because "[t]he State needed these results in order to prove or establish some fact, the identity of the perpetrator, at the jury trial."  He argues that this case is distinguishable from Williams first because Deadwiller "sought substantive use" of Orchid's result.  In other words, "Witucki testified substantively that the Orchid Cellmark DNA results revealed the name of Richard Deadwiller."  He argues that Williams is further distinguishable because Deadwiller had a jury trial and Williams had a bench trial.

¶29 The State argues that the judgment of Williams is controlling.  It asserts that Deadwiller and Williams stand in

21

substantially identical positions, and therefore, the result in Williams——that the witness' reliance on the out-of-state laboratory's DNA profile did not violate the defendant's right to confrontation——is controlling.

¶30 "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193 (1977) (internal quotations and citations omitted). This rule is applicable only when "at least two rationales for the majority disposition fit or nest into each other like Russian dolls." Evan H. Caminker, Precedent and Prediction: The Forward-Looking Aspects of Inferior Court Decisionmaking, 73 Tex. L. Rev. 1, 33 n.120 (1994). If no theoretical overlap exists between the rationales employed by the plurality and the concurrence, "the only binding aspect of the fragmented decision . . . is its 'specific result.'" Berwind Corp. v. Comm'r of Soc. Sec., 307 F.3d 222, 234 (3d Cir. 2002) (citation omitted). A fractured opinion mandates a specific result when the parties are in a "substantially identical position." Id.

¶31 "We need not find a legal opinion which a majority joined, but merely 'a legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree.'" People v. Dungo, 286 P.3d 442, 455 (Cal. 2012) (Chin, J., concurring) (citation omitted). Therefore, "we must identify and apply a test which satisfies

22

the requirements of both Justice [Alito's] plurality opinion and Justice [Thomas's] concurrence." Id. at 456.

¶32 Though the opinions of Justice Alito and Justice Thomas in Williams have no theoretical overlap, we still apply the case because Deadwiller and Williams are in substantially identical positions.  Further, applying the tests of Justice Alito and Justice Thomas results in the same conclusion as in Williams, a conclusion with which five Justices agree that Witucki's testimony did not violate Deadwiller's right to confrontation.  Deadwiller and Williams are in substantially identical positions, in fact, the facts of this case are strikingly similar to the facts in Williams.  We reject the defendant's arguments that Orchid's DNA profiles were used "substantively" in this case but not in Williams, and we reject his argument that because he had a jury trial, Witucki's testimony violated the Confrontation Clause.  See infra, n.11. Both cases involve defendants accused of sexually assaulting a victim.  In both cases, the victim reported the crime and underwent a sexual assault examination, which produced vaginal swabs containing DNA of the perpetrator.  In both cases, police officers picked up the evidence, inventoried the evidence, and sent the evidence to the state crime lab, which then sent the evidence to an out-of-state laboratory for DNA testing. Further, the out-of-state laboratory in both cases sent back the genetic material and a DNA profile of the perpetrator produced from the vaginal swabs.  In both cases, state crime lab analysts entered the DNA profile into a DNA database, which resulted in a

23

match to the defendant.[10]  When called to testify, the state crime lab analyst in both cases reported that the DNA profile sent by the out-of-state lab matched the DNA profile resulting from the database.  The DNA profile was not introduced into evidence in either case.  Prosecutors in both cases introduced inventory reports, evidence receipts, and testimony to prove a chain of custody, i.e. that the DNA profile was produced from swabs taken from the victims.

¶33 Applying the rationales of Justice Alito and Justice Thomas "'necessarily produce[s] results with which a majority of the Court from that case would agree.'"  Dungo, 286 P.3d at 455 (Chin, J. concurring)(citation omitted).  Under Justice Alito's first rationale, Orchid's DNA profiles were not used for the truth of the matter asserted.  Williams, 567 U.S. ___, 132 S. Ct. at 2236.  Just as Lambatos' testimony was not admissible for the purpose of proving that Cellmark's DNA profile was produced from semen found in L.J.'s vaginal swabs under Illinois and federal law, see id., nor is Witucki's testimony admissible for proving that Orchid's DNA profiles were produced from semen found in Kristina S. or Chantee O.'s vaginal swabs.  See Wis.

---

[10] To the extent that the facts differ, Witucki's involvement in the DNA testing was more substantial than Lambatos' involvement.  After Witucki obtained a match from the database, he obtained a buccal swab from Deadwiller, developed a DNA profile from that swab, and reconfirmed that Deadwiller was a match to the DNA profiles produced by Orchid.  Witucki's more substantial involvement in the DNA testing weighs against Deadwiller's argument that Witucki's testimony violated his right to confrontation.

Stat. § 907.03.   As the prosecutor did in <u>Williams</u>, the State used traditional chain of custody evidence to prove that Orchid's DNA profiles were produced from the swabs taken from Kristina S. and Chantee O.[11]   567 U.S. ___, 132 S. Ct. at 2237, 2239.

¶34 Under Justice Alito's second rationale, Orchid's DNA profiles did not run afoul of the Confrontation Clause because they did not involve "out-of-court statements having the primary

---

[11] Deadwiller makes much of Justice Alito's statement that "there would have been a danger of the jury's taking Lambatos' testimony as proof that the Cellmark profile was derived from the sample obtained from the victim's vaginal swabs.  Absent an evaluation of the risk of juror confusion and careful jury instructions, the testimony could not have gone to the jury." <u>Williams</u>, 567 U.S. at ___, 132 S. Ct. at 2236.  However, Justice Alito followed that statement by confirming that the Confrontation Clause applies equally to bench and jury trials: "We do not suggest that the Confrontation Clause applies differently depending on the identity of the factfinder. Instead, our point is that the identity of the factfinder makes a big difference in evaluating the likelihood that the factfinder mistakenly based its decision on inadmissible evidence."  <u>Id.</u> at 2237 n.4.  Similar to <u>Williams</u>, we find no evidence in the record that the jury understood Witucki's testimony to prove the truth of the matter asserted, that Orchid's DNA profiles were produced from the swabs of Kristina S. and Chantee O.   First, the State called several police officers and introduced inventory reports and receipts to prove a chain of custody for the swabs. <u>See supra</u>, ¶¶9-12.  Second, the jury was given instructions on how to evaluate an expert's testimony: "In determining the credibility of each witness and the weight you give to the testimony of each witness, consider . . . the opportunity the witness had for observing and knowing the matters the witness testified about . . . . Ordinarily a witness may testify only about facts, but a witness with expertise in a particular field may give an opinion in that field.    So you should consider the qualifications and credibility of the expert, the facts upon which the opinion is based, and the reasons given for the opinion."

purpose of accusing a targeted individual of engaging in criminal conduct." Id. at 2242. As in Williams, Deadwiller was not under suspicion at the time Orchid conducted its analysis. In seeking the DNA profile, the State's "primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time."[12] Id. at 2243.

¶35 Under Justice Thomas' rationale, Orchid's DNA profiles lacked the solemnity of an affidavit or deposition. Id. at 2260. There is no indication that the Orchid analyst swore to the test results or that the DNA profiles contained certified declarations of fact.[13] Id. Even though the reports were produced at the request of the police, there is no evidence that they were the product "of any sort of formalized dialogue resembling custodial interrogation." Id.

¶36 Deadwiller is in a substantially identical position as Williams. Berwind, 307 F.3d at 234. Applying the rationales of

---

[12] The Supreme Court recently concluded that criminal suspects can be subjected to a DNA test after being arrested and brought to the police station for a serious offense but before they are convicted of the offense. Maryland v. King, 133 S. Ct. 1958 (2013). In reaching that conclusion, the Court highlighted the importance of DNA evidence with respect to solving crimes. Id. at 1966-80.

[13] Orchid's DNA profiles are not in the record before this court. When an appellate record is incomplete with respect to an issue raised by the appellant, we assume that the missing material supports the trial court's ruling. State v. Benton, 2001 WI App 81, ¶10, 243 Wis. 2d 54, 625 N.W.2d 923 (citing Duhame v. Duhame, 154 Wis. 2d 258, 269, 453 N.W.2d 149 (Ct. App. 1989)).

Justice Alito and Justice Thomas leads to the same conclusion as in Williams——Witucki's testimony did not violate Deadwiller's right to confrontation.   Further, it is worth nothing that in this case, Deadwiller did not challenge the substance of Witucki's testimony.   The accuracy of the DNA results was a side issue in this case because Deadwiller's defense was that the intercourse did occur but that the victims consented.

¶37 Our conclusion is consistent with past Wisconsin Confrontation Clause jurisprudence, namely State v. Williams and Barton.   In State v. Williams, the defendant was charged with, inter alia, possession of cocaine with the intent to deliver. 253 Wis. 2d 99, ¶1.   At trial, the original analyst was unavailable to testify, and another analyst, Sandra Koresch, who had performed a peer review of the original analyst's work, testified that the substance Williams was charged with possessing was cocaine.   Id., ¶4.   The defendant argued that Koresch's testimony violated his right to confrontation.   Id., ¶5.   The court concluded that Williams' right to confrontation had not been violated:

> [T]he presence and availability for cross-examination of a highly qualified witness, who is familiar with the procedures at hand, supervises or reviews the work of the testing analyst, and renders her own expert opinion is sufficient to protect a defendant's right to confrontation, despite the fact that the expert was not the person who performed the mechanics of the original tests.

Id., ¶20.   However, "one expert cannot act as a mere conduit for the opinion of another."   Id., ¶19.

27

¶38 In Barton, the defendant was charged with arson. 289 Wis. 2d 206, ¶3. The original analyst, David Lyle, had retired by the time of Barton's trial, and the technical unit leader, Kenneth Olson, testified that there had been ignitable substances found at the scene of the crime. Id., ¶4. Olson had performed a peer review of Lyle's tests and presented his own conclusions regarding the tests to the jury. Id. Under State v. Williams, the court concluded that Barton's right to confrontation had not been violated:

> Like the unit leader's testimony in [State v.] Williams, Olson's testimony was properly admitted because he was a qualified unit leader presenting his individual, expert opinion. Olson not only examined the results of Lyle's tests, but he also performed a peer review of Lyle's tests. He formed his opinion based on his own expertise and his own analysis of the scientific testing. He then presented his conclusions to the jury, and he was available to Barton for cross-examination. Thus, Olson's testimony satisfied Barton's confrontation right and is admissible under the supreme court's decision in [State v.] Williams.

Id., ¶16. The court of appeals also rejected Barton's argument that Crawford undermined the rule of State v. Williams. Id., ¶20. The court stated that "[a] defendant's confrontation right is satisfied if a qualified expert testifies as to his or her independent opinion, even if the opinion is based in part on the work of another" expert:

> Crawford does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion

28

are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion.

Id., ¶¶20, 22 (quoting People v. Thomas, 30 Cal. Rptr. 3d 582, 587 (Cal. Ct. App. 2005)).

¶39 Deadwiller asserts that this case is distinguishable from State v. Williams and Barton because Witucki was merely a conduit for Orchid's analysis. The State argues that just as in State v. Williams and Barton, a defendant's right to confrontation was not violated because Witucki was highly qualified as an analyst, reviewed Orchid's work, and independently determined that the DNA recovered from the victims was a match to Deadwiller.

¶40 In this case, Witucki's testimony was similar to that of the testifying analyst in State v. Williams and Barton. Witucki was a highly qualified expert. When the victims' swabs first came in, Witucki confirmed the presence of semen. Once Witucki received Orchid's DNA profile, he reviewed the profile to make sure that Orchid followed its procedures and quality control measures and that it obtained acceptable results. Witucki also evaluated the profile to make sure it was of sufficient quality to enter into the DNA database. After the computer showed a match between Deadwiller and the Orchid DNA profiles, Witucki obtained a buccal swab from Deadwiller, developed a DNA profile from that swab, and reconfirmed that Deadwiller was a match. Thus, Witucki was not merely a conduit for Orchid's DNA profiles, but he independently concluded that Deadwiller was a match to Orchid's DNA profiles. See State v.

29

_Williams_, 253 Wis. 2d 99, ¶20. Therefore, Witucki's testimony was sufficient to protect Deadwiller's right to confrontation.

## B. Harmless Error

¶41 Assuming _arguendo_ that allowing Witucki to testify about Orchid's DNA profiles violated Deadwiller's right to confrontation, that violation was harmless. A Confrontation Clause violation does not result in automatic reversal, but is subject to harmless error analysis. _State v. Jensen_, 2011 WI App 3, ¶30, 331 Wis. 2d 440, 794 N.W.2d 482; _State v. Weed_, 2003 WI 85, ¶28, 263 Wis. 2d 434, 666 N.W.2d 485; _State v. Williams_, 253 Wis. 2d 99, ¶50. For an error to be harmless, the party who benefitted from error must show that "'it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" _State v. Martin_, 2012 WI 96, ¶45, 343 Wis. 2d 278, 816 N.W.2d 270 (quoting _State v. Harvey_, 2002 WI 93, ¶49, 254 Wis. 2d 442, 647 N.W.2d 189). In other words, "an error is harmless if the beneficiary of the error proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." _Id._ (internal quotations omitted). To conclude that the error was harmless, this court must determine that "the jury _would_ have arrived at the same verdict had the error not occurred." _Id._ (citations omitted). Several factors guide our analysis: "the frequency of the error; the importance of the erroneously admitted evidence; the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; whether the erroneously admitted evidence duplicates untainted evidence; the

nature of the defense; the nature of the State's case; and the overall strength of the State's case."  Id., ¶46.

¶42 Deadwiller argues that the introduction of Witucki's testimony was not harmless.  Deadwiller points out that his prior statements to the police——that he had sexual intercourse with both women (asserting that it was consensual and that he paid them)——were not introduced by the State.  Deadwiller argues that he had to change his defense strategy because of the violation, i.e. he decided to testify that the sex was consensual only after the State introduced the DNA evidence.  The State, on the other hand, argues that any error was harmless.  Deadwiller admitted that he was the source of the semen, and his defense strategy throughout the whole proceedings was that the sex was consensual.

¶43 We agree with the State and conclude that even if admitting Witucki's testimony violated Deadwiller's right to confrontation, that error was harmless.  First, Deadwiller made statements to the police admitting that he had sexual intercourse with the victims.  At a pretrial conference, the court asked the prosecutor whether he intended to use those statements, and he responded that "I guess that is going to depend on the DNA and if the Court allows Mr. Witucki to testify.  I don't intend to use his statements.  If that is not resolved, then I may put his statements on just to show this is really a consent case."  If Witucki had not testified, the State could have used Deadwiller's statements to prove the same fact—— that Deadwiller was the source of the semen recovered from the

31

victims.   Second, Deadwiller made several statements indicating that he did not challenge the DNA results, but rather was basing his defense on the theory that Kristina S. and Chantee O. consented to the sexual intercourse.   At a pretrial conference days before the trial was scheduled to begin, Deadwiller reported that his DNA expert had not completed the review of evidence in this case.   The court informed Deadwiller that he "could go to trial with your expert if we put it at another date at a later time" and asked him several times whether he wanted to proceed without his DNA expert.   The defendant answered affirmatively six times, insisting that he wanted to proceed without his expert.   The State added that the DNA was going to be a side issue in the case; that Deadwiller's defense was going to be that the victims consented, and that this was going to be a credibility case.   Deadwiller responded that "I agree with him 100 percent."   In other words, whether intercourse occurred, the subject of the expert's testimony was irrelevant to Deadwiller's defense because his defense was that the intercourse did occur but that the victims consented.   At trial, the defendant testified that Kristina S. and Chantee O. both consented to having sexual intercourse with him and that he did not dispute that his semen was found in both victims.   Throughout the entire proceedings, Deadwiller's defense strategy was that the sexual intercourse was consensual.   Therefore, even if Witucki's testimony violated Deadwiller's right to confrontation, that error was harmless beyond a reasonable doubt.

## IV. CONCLUSION

32

¶44  We conclude that on the facts of this case, Witucki's testimony did not violate Deadwiller's right to confrontation. Applying the various rationales of Williams, a majority of the United States Supreme Court would come to the same conclusion as in Williams, that the expert's testimony did not violate the defendant's right to confrontation.  Moreover, Deadwiller did not challenge the substance of Witucki's testimony because his defense was that the intercourse did occur but that the victims consented.

¶45  Further, assuming arguendo that the admission of Witucki's testimony violated Deadwiller's right to confrontation, we conclude that the error was harmless in light of the defendant's previous admissions of sexual intercourse with the victims and the fact that throughout the proceedings, he maintained a defense that the victims consented.

*By the Court.*—The decision of the court of appeals is affirmed.

¶46  MICHAEL J. GABLEMAN, J., did not participate.

¶47 SHIRLEY S. ABRAHAMSON, C.J. *(concurring).*[1] This writing is really a lament. A lament that the majority opinion reaches a result without a rationale. Because the majority opinion offers no rationale for the result, the majority opinion does not help answer the recurring significant central constitutional/evidentiary question presented, namely, "How does the Confrontation Clause apply to the panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians?"[2] This central question is ubiquitous in trial courts every day.

¶48 The majority opinion reaches its result based on the result reached by the United States Supreme Court in Williams v. Illinois, 132 S. Ct. 2221 (2012). Williams was a plurality decision. As a result of issuing a plurality decision, the United States Supreme Court has not synthesized its case law interpreting Crawford v. Washington, 541 U.S. 36 (2004), to adequately delineate the intersection of the Confrontation Clause and the rules of evidence and the application of the Confrontation Clause to the use of crime laboratory reports at trial. The instant case presents this court an opportunity to

---

[1] I concur in judgment because the alleged error, if error, was harmless. The record indicates that before trial, the defendant told detectives that he did indeed have sexual relations with the victims, but that the relations were consensual. It is not entirely clear when the defendant made these statements and the detectives did not testify at trial regarding the statements. What is clear is that at the pretrial hearing when the State remarked that the case centered on the issue of consent, the defendant did not object.

[2] Williams v. Illinois, 132 S. Ct. 2221, 2244 (Breyer, J., concurring).

1

do so. Yet the majority opinion sidesteps this opportunity and in doing so, fails to advance the law in this important area.

¶49 I write for two reasons.

¶50 First, I conclude that this court is not obligated to follow the United States Supreme Court's decision in <u>Williams v. Illinois</u> in reaching its result. The decision is not binding upon this court because there is no single or narrowest rationale upon which the majority of the United States Supreme Court relied in reaching its conclusion.

¶51 Second, in relying on <u>Williams</u> to dictate the result in the present case, the majority opinion misses an opportunity to examine more fully the important question raised regarding the intersection of the Confrontation Clause and the rules of evidence and the application of the Confrontation Clause to the numerous types of crime laboratory reports and the witnesses testifying about them.

I

¶52 The first issue is what role <u>Williams</u> should play in our court's decision in the present case. <u>Williams</u> was a plurality decision. It is not the first plurality decision of the United States Supreme Court (or this court), and it will not be the last.

¶53 Rules have been developed instructing federal and state courts how to interpret and apply plurality decisions.

¶54 The United States Supreme Court declared in <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977), that when it issues a plurality decision, with no five Justices agreeing on a

2

rationale, courts should regard the opinion of the Justice concurring on the narrowest possible grounds as the Court's ultimate holding.

¶55 This court has followed Marks in applying plurality opinions of the United States Supreme Court and in applying plurality decisions of this court. See, e.g., Vincent v. Voight, 2000 WI 93, ¶46, n.18, 236 Wis. 2d 588, 614 N.W.2d 388; Lounge Mgmt., Ltd. v. Town of Trenton, 219 Wis. 2d 13, 21-22, 580 N.W.2d 156 (1998); Tomczak v. Bailey, 218 Wis. 2d 245, 284, 578 N.W.2d 166 (1998) (Crooks, J. concurring) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, & Stevens, JJ.)).

¶56 The Marks narrowest grounds rule has been interpreted as applying only when "one opinion can be meaningfully regarded as 'narrower' than another——only when one opinion is a logical subset of other, broader opinions" and can "represent a common denominator of the Court's reasoning . . . ." King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). Therefore, "in cases where approaches differ, no particular standard is binding on an inferior court because none has received the support of a majority of the Supreme Court." Ankar Energy Corp. v. Consolidation Coal Co., 177 F.3d 161, 170 (3d Cir. 1999). "When it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme

3

Court." United States v. Alcan Aluminum Corp., 315 F.3d 179, 189 (2d Cir. 2003).

¶57 No narrowest opinion exists in Williams. No one opinion is a logical subset of another broader opinion.[3]

¶58 Five Justices of the United States Supreme Court concluded in Williams that a DNA report similar to the one introduced in the present case did not violate the Confrontation Clause. They could not agree on the reason. Four of these Justices concluded that the admission of a Cellmark report did not violate the Confrontation Clause because the report was not used to prove the truth of the matter asserted and its primary purpose was not to accuse a targeted individual of a crime. Williams, 132 S. Ct. at 2243. One Justice agreeing with the disposition of the case concluded that the report was non-testimonial because it "lacked the requisite 'formality and solemnity' to be considered 'testimonial' . . . ." Williams, 132 S. Ct. at 2255 (Thomas, J., concurring).[4]

¶59 Four Justices dissented, concluding that the admission of a Cellmark report was a Confrontation Clause violation. Williams, 132 S. Ct. at 2265 (Kagan, J., dissenting).

---

[3] For a recent law review commentary on the Marks rule, see W. Jesse Weins, Note, A Problematic Plurality Precedent: Why the Supreme Court Should Leave Marks Over Van Orden v. Perry, 85 Neb. L. Rev. 830 (2007).

[4] Justice Thomas's concurrence in Williams explicitly rejects the plurality's "flawed analysis" and asserts that "there was no plausible reason for the introduction of Cellmark's statements other than to establish their truth." Williams, 132 S. Ct. at 2255-56 (Thomas, J., concurring).

¶60 I do not view the Williams decision as binding on this court. There is no "narrowest" rationale upon which to rely. The plurality opinion and Justice Thomas's concurrence employ differing approaches to reach the same conclusion that no Confrontation Clause violation occurred, but no opinion is a "logical subset" of another.

¶61 As Justice Kagan noted in her dissent, "[I]n all except [the plurality's] disposition, [Justice Alito's] opinion is a dissent: Five Justices specifically reject every aspect of its reasoning and every aspect of its explication." Williams, 132 S. Ct. at 2265 (Kagan, J., dissenting). Therefore, although the inclusion of Justice Thomas's concurrence means five Justices reached the same result, the reasoning of the concurrence cannot be considered the narrowest grounds or the "logical subset" of the plurality opinion.

¶62 The majority opinion follows the result in Williams because the defendant in Williams and the defendant in the present case are in "substantially identical positions." Thus, the majority opinion asserts that five Justices of the United States Supreme Court would most likely reach the same conclusion as they reached in Williams if presented with the instant case. Majority op., ¶¶31-34.[5]

---

[5] The facts of the present case and Williams are somewhat different. The question is whether the differences matter. Here a jury, rather than a judge, determined the defendant's guilt. Justice Alito's plurality opinion hinted that a change in the fact-finder might be an issue. Williams, 132 S. Ct. at 2236; majority op., ¶34 n.11.

5

¶63 Without explaining why it is deviating from our precedent that relies on the Marks plurality opinion rule, the majority opinion adopts a different way of approaching a plurality decision of the United States Supreme Court. The majority opinion's new approach to a plurality decision is to ask (and answer) how five members of the United States Supreme Court would dispose of the present case. In other words, the majority opinion asks (and answers) the following question: What result would the four-member plurality in Williams plus Justice Thomas reach in the present case?

¶64 I ask, what is the effect of the majority opinion's new approach on our prior cases adopting the Marks rule? Does the majority opinion's "follow the result" rule replace the "follow the narrowest rationale" rule from Marks? Is it an interpretation of or an alternative to the Marks rule? Does the majority opinion's "follow the result" rule require that the facts of each new case be on all fours with the decision of the United States Supreme Court? Does the majority opinion's "follow the result" rule require this court to follow a certain rationale that led to that result, even though no rationale has received the support of a majority of the United States Supreme Court? Does the majority opinion's "follow the result" rule require that all of the United States Supreme Court Justices who agreed on the result still be on the Court when a new state case is presented?

¶65 Because there is no single or narrowest rationale upon which the majority in the United States Supreme Court relied on

6

reaching its conclusion in Williams, I conclude that there is no standard in Williams for this court to follow.

II

¶66 I turn now to my second point. In relying on Williams to dictate the result in the present case, the court misses an opportunity to examine the question raised regarding the intersection of the Confrontation Clause and the rules of evidence and the application of the Confrontation Clause to a wide array of crime laboratory reports and the witnesses who testify about them.

¶67 It may be fairly easy to speculate what result the Williams Court would reach in the present case when Williams was so recently decided and is so similar to the facts of the present case. It will not be as easy in other cases in the near and distant future that present different fact situations.

¶68 By adopting the result of Williams without fully setting forth a rationale, a standard, that Wisconsin courts should follow in future cases, the court has failed to strive to unbundle Confrontation Clause doctrine.

¶69 I agree with Justice Breyer, who lamented at length in Williams about the gravity of the issues left unresolved by the Williams decision. Justice Breyer would have preferred that the Court take a fresh look at the intersection of the Confrontation Clause and the rules of evidence and synthesize Crawford, Melendez-Diaz,[6] and Bullcoming[7] with the issues presented in

---

[6] Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).

[7] Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011).

7

Williams.[8]  This synthesis is essential because the Justices of the United States Supreme Court have expressed widely divergent views in these cases.

¶70 One commentary concluded that the Williams plurality opinion deferred to the Illinois rules of evidence, thus "intermingl[ing] the Confrontation Clause with state rules of evidence, . . . precisely the evil that Crawford helped to remedy . . . [and] amounting to an unacknowledged departure from Crawford itself."  The Supreme Court, 2011 Term——Leading Cases, 126 Harv. L. Rev. 176, 273 (2012).  This law review piece opines on Williams as follows:  "The Court could have avoided such a confusing outcome, if only a single additional Justice had either joined the Justices in the plurality to write a majority opinion overruling Melendez-Diaz and Bullcoming or joined the dissent and thereby strengthened and clarified the requirements of Melendez-Diaz and Bullcoming."  The Supreme Court, 2011 Term——Leading Cases, 126 Harv. L. Rev. 176, 276 (2012).

¶71 Justice Breyer also raised important practical questions.  Who may the prosecution call to testify and how many people who were involved in the laboratory should have to testify to satisfy the Confrontation Clause?[9]  Justice Breyer noted that the Williams plurality decision, like decisions before it, has failed to produce a clear, generally applicable practical answer to the Confrontation Clause issue with respect to routine crime laboratory results:

---

[8] Williams, 132 S. Ct. at 2248 (Breyer, J., concurring).

[9] Id. at 2246-47 (Breyer, J., concurring).

Once one abandons the traditional [Federal] rule [of Evidence 703], there would seem often to be no logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call <u>all</u> of the laboratory experts who did so. Experts——especially laboratory experts——regularly rely on the technical statements and results of other experts to form their own opinions. The reality of the matter is that the introduction of a laboratory report involves layer upon layer of technical statements (express or implied) made by one expert and relied upon by another.[10]

¶72 Although Justice Breyer concurred to criticize the plurality for failing to produce a clear, generally applicable rule, Justice Kagan dissented to fault the plurality for tarnishing what she viewed as the clear rule that the Court had recently espoused. Before <u>Williams</u>, two landmark Court decisions within the last three years in <u>Melendez-Diaz</u> and <u>Bullcoming</u> demanded that "a prosecutor wishing to admit the results of forensic testing had to produce the technician responsible for the analysis."[11] "But that clear rule is clear no longer," lamented Justice Kagan.[12] In failing to follow these recent decisions, the Court has "left significant confusion in [its] wake."[13]

¶73 Commentators have levied criticism at all four of the <u>Williams</u> opinions:

---

[10] <u>Id.</u> at 2246 (Breyer, J., concurring).

[11] <u>Id.</u> at 2277 (Kagan, J., dissenting).

[12] <u>Id.</u> (Kagan, J., dissenting).

[13] <u>Id.</u> (Kagan, J., dissenting).

The lack of either a majority opinion or a clear holding, in addition to the internal flaws of the various opinions, deeply muddles Confrontation Clause doctrine, leaving the clause's application to forensic evidence in question.[14]

¶74 This court should, I think, take Justice Breyer's advice and examine the issues presented and decide the present case on the basis of constitutional precedent of the United States Supreme Court and this court, learning to the extent possible from the diversity of opinions in these cases. Although the United States Supreme Court has failed to provide clear, consistent answers on the interplay of the Confrontation Clause and evidentiary rules when laboratory reports and statements are introduced or relied upon, this court should attempt to craft a constitutional standard and fashion an approach that is theoretically and practically sound.

¶75 Our re-examination of the applicable state and federal precedent would be fruitful to guide circuit courts, prosecutors, defense counsel, and expert witnesses in the conduct of trials in which an array of laboratory reports and statements are introduced or relied upon.[15] Unless we do so, courts and litigants will have little or no guidance on how to proceed when the next cases are presented in the circuit courts with different sets of circumstances and different kinds of crime laboratory reports and witnesses at issue.

---

[14] The Supreme Court, 2011 Term——Leading Cases, 126 Harv. L. Rev. 176, 267 (2012).

[15] For examples of courts taking this approach of re-examining the case law to address Confrontation Clause challenges, see United States v. James, 712 F.3d 79 (2d Cir. 2013); People v. Pealer, 985 N.E.2d 903 (N.Y. 2013).

¶76 Justice Breyer began this examination in his Williams concurrence when he acknowledged that courts and treatise writers have recognized the problem and have suggested at least six different solutions.[16] All of the approaches assume some kind of Crawford boundary——some kind of limitation upon the scope of Crawford——delineating who may be permitted to testify and upon what evidence they may rely.[17] This standard would respect defendants' constitutional rights to confront the witnesses who collect, process, and analyze the evidence presented at trial while not requiring every person who has ever touched the evidence to testify in court.

¶77 Not only must this court harmonize Williams with Crawford, Melendez-Diaz, and Bullcoming, but it must also

---

[16] Williams, 132 S. Ct. at 2247-48 (Breyer, J., concurring).

[17] Id. at 2248 (Breyer, J., concurring).

As a basis for discussion, Justice Breyer's concurrence provides the following alternative solution to help satisfy the Confrontation Clause:

[S]hould the defendant provide good reason to doubt the laboratory's competence or the validity of its accreditation, then the alternative safeguard of reliability would no longer exist and the Constitution would entitle [the] defendant to Confrontation Clause protection.

Williams, 132 S. Ct. at 2252 (Breyer, J., concurring).

For commentary on Williams, see, e.g., Michael A. Sabino & Anthony Michael Sabino, Confronting the "Crucible of Cross-Examination": Reconciling the Supreme Court's Recent Edicts on the Sixth Amendment's Confrontation Clause, 65 Baylor L. Rev. 255 (2013).

harmonize Wisconsin court decisions such as <u>State v. Williams</u>[18] and <u>State v. Barton</u>.[19]  The majority opinion, relying more on the result of <u>Williams</u> than the rationale of the <u>Crawford</u> line of cases, leaves this major task undone.

¶78  For the reasons set forth, I write separately.

¶79  I am authorized to state that Justice ANN WALSH BRADLEY joins Part I of this opinion.

---

[18] <u>State v. Williams</u>, 2002 WI 58, 253 Wis. 2d 99, 644 N.W.2d 919.

[19] <u>State v. Barton</u>, 2006 WI App 18, 289 Wis. 2d 206, 709 N.W.2d 93.

¶80 ANN WALSH BRADLEY, J. (*concurring*). I join the majority opinion in concluding that even if Deadwiller's rights under the Confrontation Clause were violated, the error here is harmless. Majority op., ¶3. Therefore I join Section III.B of the majority opinion.

¶81 However, for the reasons set forth in Section I of the concurring opinion, I cannot join the majority's discussion of Williams v. Illinois, 132 S. Ct. 2221 (2012) or its application of Williams to this case. See majority op, ¶¶20-35; Chief Justice Abrahamson's Concurrence, ¶¶52-65. Therefore I join Section I of the concurring opinion. Accordingly, I respectfully concur.